Arthur L. JACKSON, Appellant,

v.

William L. MORROW et al., Appellees.

No. 23617.

United States Court of Appeals Fifth Circuit.

Dec. 4, 1968.

---

Oscar W. Adams, Jr., Demetrius C. Newton, Birmingham, Ala., Norman C. Amaker, New York City, for appellant.

Guy Sparks, Anniston, Ala., for appellees.

Before JOHN R. BROWN, Chief Judge, BELL, Circuit Judge, and BREWSTER, District Judge.

JOHN R. BROWN, Chief Judge:

The sole question in this case is whether the system followed for supplying jurors (or its result), at the time of this trial in 1965 in the Northern District of Alabama satisfied standards exacted by the contemporary statute, the Constitution or both. We hold on this record that they do and affirm.

By timely motion filed in November 1965—prior to *Rabinowitz* [1]—the Plaintiffs-Appellants challenged the panel which had been drawn from the jury box [2] from which petit juries were to be chosen for the trial of civil cases at the November 1965 term in the Division held at Anniston, Alabama. The challenge was twofold: discriminatory exclusion of (1) Negroes and (2) women, both white and Negro.

The merits of their suit, which they lost from an adverse jury verdict, are not directly involved. But the remark is warranted that in a claim by Negroes against white police officers for police brutality and a defense of accidental injuries resulting from restrained efforts to subdue recalcitrant, intoxicated persons, the resolution of this swearing match imperatively called—as do all trials for that matter—for a jury free of discriminatory exclusions.

Although the Northern District comprises 31 counties divided into 7 Divisions and a correspondingly large geographical area, both urban and rural, with an adult population exceeding a million, only a single jury box, 28 U.S. C.A. § 1864 (see note 2, supra) was maintained for the whole district. It contained 6,000 names of qualified jurors. Subsequent to the 1957 revisions brought about by the 1957 Civil Rights Act, the box had been emptied and refilled twice, the first time in 1959, the last time in 1963.

---

1. Rabinowitz v. United States, 5 Cir., 1966, 366 F.2d 34 (en banc).

2. The jury "box" refers to the wheel or box in which names of persons qualified for jury service are placed. See the former 28 U.S.C.A. § 1864. The "panel" or "venire" is the list drawn from the box and out of which particular petit juries are to be selected.

The venire (see note 2, supra) from which the jury to try this case was to be chosen comprised 39 persons. Of this group 36 were white and 3 were Negro. Of these, 37 were men and 2 were women. The gross composition of the population of the District, however, showed that of the one million adults potentially eligible for jury service, 79 percent were white, 21 percent were Negro, 47% were men, and 53% women.[3]

Although the compositions of the different Divisions within the District varied greatly in population, in the urban of rural character of the component counties, and in the racial characterization of the counties, the jury box with its "universe" of 6,000 for the whole District, theoretically reflected the composite characteristics, since for each of the Divisions [4] (and their integral counties) there was put in the box the proportion that the number of adults in that Division (and county) bore to the total adult population in the District (see note 3, supra).

But it is the asserted difference between this "theoretical" and the actual that forms the basis for the attack on the jury selection system of this District. In essence it is that the names going into the master jury box (note 2, supra) were not selected at random from a source which reflected the makeup of the community. To the contrary, the argument continues, the names came from those subjectively obtained from and recom-

3. *Adult Pop.*

| | | Percentage |
|---|---|---|
| White | 840,933 | 79.18% |
| Negro | 221,122 | 20.82% |
| | 1,062,055 | 100.00% |
| Men | 503,595 | 47.41% |
| Women | 558,460 | 52.59% |

As between white-Negro males, white-Negro females the figures break down as follows:

| | *TOTALS* | | *Percentage* | |
|---|---|---|---|---|
| White Males | 403,741 | | 38.01% | |
| White Females | 437,202 | | 41.17% | |
| Total White | | 840,943 | | 79.18% |
| Negro Males | 99,854 | | 9.40% | |
| Negro Females | 121,258 | | 11.42% | |
| Total Negro | | 221,112 | | 20.82% |
| | | | | 100.00% |

[4]The breakdown is substantially as follows:

| Division | White Males | White Females | Total Whites | Percent. Whites | Negro Males | Negro Females | Total Negroes | Percent. Negroes |
|---|---|---|---|---|---|---|---|---|
| Northwestern | 31,372 | 33,809 | 65,109 | 87% | 4,004 | 4,942 | 8,946 | 13% |
| Northeastern | 77.207 | 80,092 | 157,299 | 80% | 10,334 | 12,001 | 22,333 | 20% |
| Southern* | 134,518 | 150,940 | 285,458 | 70% | 53,536 | 65,891 | 119,427 | 30% |
| Eastern | 39,480 | 43,234 | 62,714 | 80% | 9,042 | 10,638 | 19,680 | 20% |
| Western | 32,133 | 32,796 | 64,929 | 65% | 14,957 | 18,553 | 33,510 | 35% |
| Middle | 57,736 | 62,483 | 120,219 | 92% | 5,368 | 6,188 | 11,556 | 8% |
| Jasper | 31,295 | 33,848 | 65,143 | 92% | 2,613 | 3,045 | 5,658 | 8% |

*Note: This includes Jefferson County (Birmingham)

mended by "key" men[5] who were too narrowly chosen and who were both inadequately and erroneously instructed.

The heart of this challenge is that in the selection of fewer Negroes than white persons as key men, fewer women of both races than men, and in the failure to instruct the "key men" at least in general terms concerning the broad constitutional aim for jury composition, the structure failed to meet the standards we undertook to lay down in *Rabinowitz* (note 1, supra) to attain a fair cross section of the community.[6]

The instant case and its outcome is, of course, of vital concern to the parties. But in view of the intervening Jury Selection and Service Act of 1968, P.L. 90–274, 82 Stat. 54, 28 U.S.C.A. §§ 1861–1869, March 27, 1968, which calls for sweeping changes in the Federal Court jury selection process, including the promulgation and approval of a formal plan for each District (28 U.S.C.A. § 1863), including the Northern District of Alabama,[7] what we write—unlike the aim of most appellate opinions—could afford no useful guidance for the future. Indeed, writing about an era now statutorily terminated might do much harm.

■ Consequently it is enough to say that the proof here does not measure up to that in *Rabinowitz*. Unlike *Rabinowitz*, there is no adequate showing here that the system followed produced a source (the jury box) from which jurors were obtained which spectacularly was not a cross section of the community.[8] In our present record, there was no proof offered (or sought) concerning the internal breakdown of the 6,000 names in the jury box from which its makeup could be determined and then matched against traditional standards as to racial (or other) discrimination. See, e. g., Swain v. State of Alabama, 1965, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 and cases referred to note 6, supra.

All we have here is testimony concerning the number of white males, Negroes, and women of both races on the typical or average venire (see note 2, supra) summoned for the week of case. This is clearly a long way from establishing the make-up of the larger source—the jury box of 6,000 names. The venire was what remained after all excuses had been allowed. These included—to a liberal extent on the Judge's own unchallenged word stated into the record—women with family responsibilities. Included also were the traditional individual mileage and hardship excuses which would encompass laborers, many of whom are Negroes. There is thus a total gap which makes it unsafe—either statistically or judicially—to draw inferences on mathematical probabilities using the venire result as both the starting and ending point.

The attack fails, without more, for want of proof either as to the race or sex composition of the jury box, see Grimes

---

5. Complaint is also made, alone and jointly with the broader attack, that the "key men" were advised by the Clerk's written instruction sheet to select persons whom that key man " * * * would want to have on the jury to pass on his rights to his life or to his property."

6. This was one of six jury discrimination cases heard en banc. See Brooks v. Beto, 5 Cir., 1966, 366 F.2d 1, n. 1 (en banc), cert. denied, 1967, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135.

7. In September 1968, formal jury plans for all Districts within the Fifth Circuit were submitted to and approved by a reviewing panel made up on the Judicial Council of the Fifth Circuit and each respective Chief District Judge.

8. See the detailed analysis of the figures in Judge Rives' monumental opinion for the Court, especially at 366 F.2d 37–39, 43–44. The *Rabinowitz* record revealed a detailed factual breakdown of the entire jury box (see note 2, supra). Against a 1960 population base of 34.55% Negro adults, the 1953 jury box contained only 7% Negroes. With additions in 1959 the jury box comprising 1985 persons contained only from 117 Negros (5.9%). Worse, of the 557 new names added to the jury box in 1959, only 4 or .07% were Negro.

v. United States, 5 Cir., 1968, 391 F.2d 709, cert. denied, 393 U.S. 825, 89 S.Ct. 87, 21 L.Ed.2d 96, or as to the effect, if any, of the instruction to the "key" men (see note 5, supra).[9]

Affirmed.

---

9. See Hunt v. United States, 5 Cir., 1968, 400 F.2d 306 [August 19, 1968].