Josephine **HARDIN**, as Executrix of the Estate of Edie Houseal, Deceased, Plaintiff,

v.

The **CITY OF GADSDEN**, Defendant.

**R.L. Webb, Julius Walker, and The City of Birmingham, Alabama, Plaintiffs–Intervenors,**

**United States of America, amicus curiae.**

Civ. A. No. 89–C–2164–M.

United States District Court, N.D. Alabama, M.D.

Nov. 12, 1993.

Robert M. Shipman, Earl D. McNeal, Huntsville, AL, for plaintiff.

Don G. DeCoudres, Birmingham, AL, Donald R. Rhea, Rhea Boyd & Rhea, Jack Floyd, Floyd Keener Cusimano & Roberts, Gadsden, AL, Julius F. Parker, Jr., Jennifer Parker LaVia, Parker Skelding Labasky & Corry, Tallahassee, FL, Roger W. Kirby, City of Gadsden, Legal Dept., Gadsden, AL, for defendants.

Joe R. Whatley, Jr., Samuel H. Heldman, Cooper Mitch Crawford Kuykendall & Whatley, Donald V. Watkins, Demetrius C. Newton, Birmingham City Attorney's Office, Birmingham, AL, for plaintiffs-intervenors City of Birmingham and R.L. Webb.

Kenneth Lamar Thomas, Thomas Means & Gillis, Montgomery, AL, for plaintiff-intervenor Julius Walker.

Caryl P. Privett, Claude Harris, U.S. Attorney's Office, Birmingham, AL, for amicus curiae U.S.

### MEMORANDUM OPINION

CLEMON, District Judge.

Civil litigants in the federal courts have a right to petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. 28 U.S.C. § 1861 (Supp.1993). Moreover, no citizen may be excluded from service as a petit juror because of race or economic status. 28 U.S.C. § 1862 (Supp. 1993). According to the evidence, the Northern District of Alabama is the country's only statutorily-divided judicial district whose jury plan provides for the use of district-wide jury wheels in civil cases.

A substantial majority (64%) of the district's eligible black voters live in two of the district's seven divisions. The district covers half of the state. Aside from interstate carriers, there is no inter-division public transportation. A one-way distance from a community in one division to the courthouse in another may be as great as 223 miles. Black households in the district are disproportionately poor and lack motor vehicles. The Jury Plan of the Northern District of Alabama (the "Plan") does not provide for the advancement of expenses to summoned jurors whose service will require long-distance travel and overnight lodging. On many of the civil petit juries in the Northern District, there are no blacks and on others, there is only one black.

In this factual milieu, plaintiff and the intervenors raise three pregnant questions on their motion to quash the venire. (1) Does the Northern District's use of a district-wide jury plan deny black litigants their right to a jury selected from a "fair cross section of the community in the district or division wherein the court convenes?" (2) Does the use of the district-wide plan disproportionately exclude blacks from the opportunity to be considered for jury service because of their race and economic status? (3) Finally, does the exclusive use of voter lists satisfy the "fair cross-section" requirement?

Plaintiff and intervenors' challenges of the Northern District's master jury wheel ("MJW") and qualified jury wheel ("QJW") are based on the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1878 (Supp. 1993), ("the Act") and the due process clause of the Fifth Amendment to the United States Constitution.

Plaintiff Josephine Hardin is the administratrix of the estate of Edie Houseal, a deceased black woman. In the main action, plaintiff contends that the City of Gadsden, Alabama was deliberately indifferent to the known medical needs of the decedent, in violation of 42 U.S.C. § 1983. Intervenor City of Birmingham is the largest city in the State of Alabama. It has a majority black citizenry. Intervenors R.L. Webb and Julius

Walker are individual black citizens who reside in the Southern Division. All of the intervenors are litigants in ongoing jury-demanded litigation in the Northern District. Plaintiff and the intervenors have standing to challenge the Plan because they are litigants and they raise claims of racial discrimination. 28 U.S.C. §§ 1861, 1862 (Supp.1993).

The United States has appeared as *amicus curiae.* It takes the position that the use of a district wide plan does not violate the Act, and that the voter lists alone properly represent a fair cross section of the community.

■ Based on the accompanying Findings of Fact and Conclusions of Law, the Court concludes that the plaintiff and intervenors have carried their burden of proof that the Northern District's continued use of district-wide jury wheels violates the Act.[1]

I

The Plan provides that "the official voter registration lists maintained by the *counties comprising the district represent a fair cross-section of the community....*" Intervenor Exhibit ("IX") 1 (emphasis added). In the view of the Plan, the district itself is "the community." Notably, the Act requires something more than juries selected at random from the district. It requires that jurors represent a fair cross section of the community "wherein the court convenes" in the district or division.[2]

The factual findings make it abundantly clear that the demographics of the various divisions in the Northern District differ substantially. Early on, prior to the existence of the Act and its "fair cross section of the community" requirement, our predecessor circuit noted that "the compositions of the different Divisions within the [Northern] District varied greatly in population, in the urban or rural character of the component counties, and in the racial characterizations

of the counties...." *Jackson v. Morrow,* 404 F.2d 903, 905 (5th Cir.1968).

The Eleventh Circuit has recognized the vast differences between communities in the divisions of the Northern District. In discussing the propriety of requiring a Huntsville resident to be tried in Birmingham, the Circuit observed that "one must not arbitrarily be sent, without his consent, into *a strange locality* to defend himself against the powerful prosecutorial resources of the Government. We must remember in applying Rule 18 that Huntsville is almost 100 miles from Birmingham" *United States v. Burns,* 662 F.2d 1378, 1382 (11th Cir.1981) (citations and internal quotation marks omitted) (emphasis added). Elsewhere in the opinion, the Circuit described the Southern Division as "an environment alien to the [Huntsville defendant]." *Id.* at 1383.

The word "community," in its plain and ordinary meaning, denotes a unified body of individuals with common interests living in a particular area. *Webster's Ninth New Collegiate Dictionary* 267 (1987). Legally, it has the same meaning: "neighborhood; vicinity, synonymous with locality." *Black's Law Dictionary,* 254 (5th ed. 1979). It is "a society or body of people living in the same place, under the same laws and regulations, who have common rights, privileges, or interests." *Id.*

The First Judiciary Act and the predecessor statutes all provided that "[g]rand and petit jurors shall from time to time be selected *from such parts of the district* as the court directs...." Erwin Surrency, *History of the Federal Courts,* 172 (1987) (emphasis added). In 1911, Congress authorized district courts to maintain "separate jury boxes for some or all of the places for holding court in the district." 28 U.S.C. § 1865 (1966).[3] These references place in historical perspec-

---

1. In light of the resolution of these issues on statutory grounds, the Court does not reach the constitutional issues.

2. Apparently the words "district or division" as they appear in § 1861 were necessary because of the existence of four federal judicial districts which have no statutory divisions and only one place of holding court. These districts include

Delaware, the District of Columbia, Hawaii, and Rhode Island. *See* 28 U.S.C. §§ 87, 88, 91 and 120 (1993).

3. This provision simply provided a statutory basis for the existing practice in many districts. *See* Historical and Revision Notes, 28 U.S.C. § 1865 (1966).

tive the intent of Congress when it utilized the phrase "fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861 (1993).

At least in this Circuit, every district court has concluded that the divisional, rather than district-wide, QJWs best satisfy the "cross section of the community" and the "opportunity to serve on petit juries" objectives of the Act.

## II

Given the extent of poverty and lack of vehicles among blacks in the Northern District generally, the use of a district-wide jury wheel disproportionately denies them the opportunity to serve on juries outside their divisions. When poverty-stricken blacks residing in the Southern Division are summoned to serve in Birmingham, it is reasonable for the Clerk to expect those jurors to take a public bus to and from the federal courthouse daily during the term of Court. However, if those same jurors are summoned to serve in Florence—some 120–140 miles away—that option is simply unavailable. When a black voter in Pickens County . (where one-third (31.5%) of the blacks lack transportation and over half (54.2%) are in poverty) is summoned to serve in the Western Division, she may be able to "bum a ride" to Tuscaloosa; but if that same prospective juror is summoned to serve in the Southern Division, it is unlikely that she will appear for trial in Birmingham. Most likely, the juror would seek and probably receive an excuse from service, or will simply fail to report. Under either scenario, the effect is the same on both black litigants and on blacks who are entitled to jury service consideration.

The statutory policies that "all citizens shall have the opportunity to be considered for service," and that "no citizen shall be

excluded from [jury] service on account of race ... or economic status"[4] are frustrated by the use of district-wide MJWs and QJWs in the Northern District of Alabama. The geographical vastness of the district, the widespread poverty of its black citizenry, and the attendant lack of the vehicles which are essential to service in other divisions render the opportunity of blacks to actually serve on its juries more theoretical than real. Thus, by their economic status, blacks are systematically excluded from jury service.[5]

## III

 The plaintiffs and intervenors also challenge the exclusive use of voter lists as the source of the MJWs and QJWs. Under established law of this Circuit, unless there is a ten-percent absolute disparity between eligible blacks in the population and those on the jury lists, there is no statutory or constitutional violation. *United States v. Pepe*, 747 F.2d 632 (11th Cir.1984); *United States v. Perez–Hernandez*, 672 F.2d 1380 (11th Cir. 1982). While the Court, were it writing on a clean slate, would utilize the comparative disparity analysis established in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Eleventh Circuit has eschewed comparative analysis and embraced the absolute disparity approach in cases such as this where the minority group exceeds ten percent of the eligible population. *United States v. Rodriguez*, 776 F.2d 1509 (11th Cir.1985); *United States v. Butler*, 615 F.2d 685, 686 (5th Cir.1980).

As found earlier, in the district as a whole, the disparity is less than ten percent. There is no such disparity in five of the seven divisions. However, the disparity is greater than ten percent in both the Southern and Western Divisions. As to those divisions, the *prima facie* case has been established.

---

**4.** Section 1862 of the Act provides:
 No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States ... on account of race, color, religion, sex, national origin, or economic status.
 28 U.S.C. § 1862 (Supp.1993).

**5.** The United States has suggested that the district-wide MJW and QJW assure the presence of

blacks on juries in all divisions of the district. But in those divisions where blacks represent only a small percentage of the eligible jury pools, one would not reasonably expect to find substantial numbers of black jurors. Purposeful, non-remedial inclusion and intentional exclusion based on race are equally violative of the "fair-cross section of the community" requirement of the Act.

This judge is not empowered to enjoin the continued observance of the Plan by his fellow judges. But having found that the plan violates the law and policy of the United States insofar as it requires the use of district-wide jury wheels in civil cases, this judge will not follow the Plan. In Southern and Western Division cases, this judge shall use jurors from the respective divisions, in the absence of a waiver by the parties.

The question of whether the jury rolls from the Southern and Western Divisions must be supplemented by other sources need not now be addressed. First, a new jury plan has already or will shortly go into effect. Evidence of racial composition of the jury wheels under that plan is not before the Court. Moreover, this judge's use of only Southern and Western juries may well result in the elimination of the present disparities. Only time, experience, and further evidence can tell.

### FINDINGS OF FACT

#### The Jury Plan And Its Results

1. Consistent with its obligation under the Act,[6] the Northern District of Alabama adopted the Plan for the selection of jurors. The Judicial Council of the Eleventh Circuit approved the Plan in August 1989.

2. Under the Plan, separate jury wheels are not maintained for the various divisions of the Court.[7]

3. The Plan recites the Court's determination that the official voter registration lists maintained by the counties in the district "represent a fair cross-section of the community and that inclusion of names from other sources is not necessary to foster the policies and protect the rights secured" by the Act. 28 U.S.C. § 1861 (Supp.1993). The Clerk of the Court must obtain from appropriate county officials the most recent official list of registered voters in each county in the Northern District.

4. From the voter lists, the Clerk establishes a district-wide MJW; and from the MJW, a district-wide QJW is established. The QJW consists of those voters "determined to be qualified and not exempt or indefinitely excused from jury service."

5. The Clerk must empty and refill the MJW at least every four years. The MJW consists of at least three percent (3%) of the voters on each county's registration lists. The Clerk randomly selects these persons by publicly drawing by lot a number between one and thirty-three. The person's name on each county's list corresponding to that number, and then each thirty-third[8] name thereafter, become the MJW. When the MJW is refilled, the Clerk prepares a report reflecting the time and manner of selection, the source and number of names, and the composition of the MJW. The Chief Judge may order additional names in the interim between quadrennial refillings using the same method.

6. The QJW is electronically selected from the MJW. The QJW must include persons from each county within the district proportionate to the percentage of voters from those counties in the MJW. Each person selected from the MJW is then sent a juror qualification form ("questionnaire"), as required by § 1864(a) of the Act. From the

---

6. Section 1863(a) of the Act requires each federal district court to adopt and implement a written plan for the random selection of grand and petit jurors. The plan must be designed to achieve the twin objectives of (1) randomly selected juries representing a fair cross section of the community, and (2) non-discrimination on account of race, economic status, or other prohibited reasons. 28 U.S.C. § 1863(a) (Supp.1993).

7. The United States and the parties to the challenge have stipulated that prior to the late 1940s, the Northern District used a district-wide jury box or wheel. For a few years in the late 1940s and/or early 1950s, the Court used division-based jury boxes or wheels. After that time, the Court returned to a district-wide jury box or wheel. In the late 1940s and early 1950s, there were no blacks in any jury box or wheel for the Northern District of Alabama. After the passage of the Act, the Northern District continued its practice of using a district-wide jury wheel and began selecting the persons to be included on the wheel from registered voter lists.

8. The Plan has been modified in practice to utilize the thirty-fifth, rather than the thirty-third, name because fewer jurors were actually needed. This change has not been submitted for approval to the Reviewing Panel of the Judicial Council, but there is no challenge to it.

completed and returned questionnaires, jurors are qualified and the QJW is established. Jurors are then summoned as needed. This procedure is a "two step" procedure: qualification and summoning.[9]

7. Following the Plan and utilizing a computerized data base maintained for the Clerk by the Trustee of the United States Bankruptcy Court for the Northern District of Alabama, the Clerk sent 24,000 juror qualification questionnaires to randomly selected MJW names on a county by county basis in 1989. Of the questionnaires sent out, 5,479 (22%) were returned as "undeliverable", and the Clerk made no further attempts to reach these persons. In 3,135 cases (13%), there was no response and the Clerk undertook no follow-up efforts. The Clerk excused approximately 5,475 persons under the various grounds set forth in the Plan. Initially, the Clerk classified 9,188 persons as qualified: 7,614 whites (83%), 1,460 blacks (15.9%), 98 "other" (1.1%), and 16 unknown.

8. After reconsideration of some of the previously excused persons, the Clerk added an additional 2,095 names to the QJW: 1,850 whites (88.5%), 223 blacks (10.7%), 17 "other" (.8%), and 5 unknown. The Clerk previously excused the persons added to the QJW for the following reasons: juror service within two years; teacher or student; and custodian of child or infirm person. In September 1991, the Clerk set over for recall on the QJW 1,005 persons: 835 whites (85%), 138 blacks (14.1%), 9 "other" (.95%), and 23 unknown. This resulted in the current QJW.

9. The current QJW in the Northern District consists of 12,288 persons. Of these, 14.87% are blacks.

### Demographics of The Northern District and Its Divisions

10. The Northern District is the largest federal judicial district in the State of Alabama. Thirty-one of the State's sixty-seven counties lie within the district, which roughly covers the northern geographic half of the State. More than half (58.5%) of the State's total population and sixty percent (60%) of the voting age population live in the district. Fifty-eight percent (58%) of the State's active voters live in the district.

11. The Northern District is composed of seven statutory divisions. 28 U.S.C. § 81(a) (1993). These include the Northwestern, Northeastern, Southern, Eastern, Western, Middle and Jasper Divisions.

12. The Northwestern Division, which sits at Florence, Alabama, consists of Colbert, Franklin, and Lauderdale counties. Blacks comprise 11% of the 159,141 persons who live in the division and 9.2% of the voting age population. In 1989, blacks accounted for 9.01% of the registered voters in the division. The 1989 per capita income was roughly $10,000. While nearly a third (31.85%) of the blacks are in poverty, only 13.79% of the whites are similarly situated. Nearly three-fourths (74.3%) of the homes in the Northwestern Division are owner-occupied. Half (51%) of the housing units are located in urbanized areas.[10] There are 35.1 housing units per square mile in the division. The *Times Daily* is the major daily newspaper of the division.

13. The Northeastern Division comprises the counties of Cullman, Jackson, Lawrence, Limestone, Madison, and Morgan. The division sits in Huntsville and Decatur. Blacks account for 13.45% of the 540,012 persons who live in the division, and 12.41% of the voting age population of the division. Approximately ten percent (10%) of the division's registered voters are black. A tenth (10.81%) of the division's whites are in pover-

---

**9.** From October 1989 through the end of 1990, the district utilized the "one-step" procedure authorized by 28 U.S.C. § 1878 (Supp.1993). Under this procedure, the questionnaire and the summons are sent simultaneously to prospective jurors.

**10.** The Census Bureau delineates urbanized areas ("UAs") to provide a better separation of urban and rural territory, population, and housing in the vicinity of large places. A UA compris-

es one or more places ("central place") and the adjacent densely settled surrounding territory ("urban fringe") that together have a minimum of 50,000 persons. The urban fringe generally consists of contiguous territory having a density of at least 1,000 persons per square mile. Bureau of the Census, U.S. Dep't of Commerce, *1990 Census of Population and Housing*, Guide, Part B. Glossary 14–17 (1990 CPH–R–1B).

ty; that status is shared by 27.62% of the blacks. The per capita income in 1989 was approximately $14,000. Of the housing units in the district, 70.9% are owner-occupied. Little more than half (57%) of the housing units are in UAs; and there is an average of 50.51 units per square mile. The *Huntsville News, Huntsville Times,* and the *Decatur Daily News* are the major newspapers of the division.

14. The Southern Division accounts for a third (790,131) of the population of the Northern District. It is made up of Blount County, Jefferson County, and Shelby County. In 1989, blacks accounted for 27.57% of the population of the division. More than half of all the black voters in the Northern district live in the Southern Division. In 1989, 27.46% of the registered voters in the district were black. The per capita income was above $13,000 in 1989. Thirty-one percent (31.14%) of the division's blacks are in poverty; while less than a tenth (8.13%) of the whites share that status. Nearly a third (32.9%) of the housing units in the division are renter-occupied. Four-fifths (82%) of housing units are in UAs. It has 106.4 housing units per square mile. It is the only division which lies wholly within a metropolitan statistical area.[11] *The Birmingham News* and *Birmingham Post–Herald* are the major newspapers of the division.

15. The Eastern Division, which sits at Anniston, Alabama, consists of Calhoun, Clay, Cleburne, and Talladega counties. It has a population of 216,123 persons, of whom 47,104 (21.79%) are black. Nearly twenty percent (19.56%) of the voting age population is black. Blacks account for 18.25% of the

division's registered voters. A third (33.79%) of the division's blacks are in poverty; and 12.9% of the whites are poverty-stricken. The per capita income in 1989 was roughly $9,800. Seventy-three percent (73%) of the housing units in the district are owner-occupied. Little more than half (57%) of housing units are in UAs. There are 33.95 housing units per square mile in the division. The *Anniston Star* is the major daily newspaper of the division.

16. The Western Division embraces three of the State's Black Belt counties—Greene, Pickens, and Sumter, as well as Bibb County and the home of the "Crimson Tide," Tuscaloosa County. It has a population of 214,124, a third (33.18%) of whom are black. Blacks compose 29.24% of its voting age population and 25.54% of its 1989 registered voters. The per capita income in 1989 was roughly $8,600. Only 13.3% of the division's whites are in poverty, but nearly half (44.36%) of the blacks are at the same income level. More than a third (34.7%) of the housing units in the division are . renter-occupied. Fifty-six percent (56%) of the housing units are in UAs. It has only 15.4 housing units per square mile. The *Tuscaloosa News* is the major daily newspaper in the division.

17. The Middle Division consists of Cherokee, DeKalb, Etowah, Marshall, and St. Clair counties. Blacks account for 7.38% of its 294,875 population. The voting age population was 6.74% black in 1990; while 7.04% of the 1989 registered voters in the division were black.[12] The per capita income was $10,500. The percentage of blacks in poverty (31.45%) nearly doubles that of whites (15.-38%). Three-fourths (76.6%) of the housing

---

**11.** The general concept of a metropolitan area ("MA") is one of a large population nucleus, together with adjacent communities that have a high degree of economic and social integration with that nucleus. Metropolitan statistical areas ("MSAs") are relatively freestanding MAs and are not closely associated with other MAs. The title of an MSA contains the name of its largest central city and up to two additional city names, provided that the additional places meet specified levels of population, employment, and commuting. Generally, a city with a population of 250,000 or more is in the title, regardless of other criteria. *Id.*

**12.** These inconsistent figures are likely the result of two phenomena confirmed by the evidence.

First, blacks are consistently undercounted by the Census Bureau. In the 1990 census, it is estimated that blacks were undercounted by 5.7 percent. *See* Plaintiff's Exhibit ("PX") 15, Kirk M. Wolter, *Accounting For America's Undercounted and Miscounted,* 253 Science 12 (5 July 1991). Secondly, the voter lists of Alabama's counties are notoriously unreliable. They frequently contain the names of dead persons and others who have moved away from the county. The testimony of Hunter Slaton, the former Director of Court Assistance of the Alabama Administrative Office of Courts, is fully credited in this regard.

units in the district are owner-occupied. Less than half (47%) of the housing units are in UAs. The housing density is 42 units per square mile. The *Gadsden Times* is the major daily newspaper in the division.

18. The Jasper Division consists of Fayette, Lamar, Marion, Walker, and Winston counties. The division has a population of 153,230, of whom 9,481 (6.19%) are black. Blacks made up 5.56% of the 1990 voting age population, and 5.78% of the 1989 registered voters. The 1989 per capita income was roughly $9,900. The poverty rate of blacks (37%) more than doubles that of whites (17.-2%). Nearly four-fifths (77.9%) of the housing units in the division are owner-occupied. Only a fourth (12.4%) of the housing units are in UAs. The housing density is 18.48 units per square mile. The *Daily Mountain Eagle* is the daily newspaper in the division.

*Distances, Transportation Problems, and Costs Involved in Present Plan; Administrative Feasibility of Divisional Plan* [13]

19. Distances between various communities in the district are sometimes considerable. For example, a juror summoned from her home in Cuba, Alabama to serve in the Northeastern Division must travel 223 miles, one-way; 200 miles for a juror summoned from Bass, Alabama to serve in the Western Division; 170 miles for a juror summoned from Bryant, Alabama to serve in the Western Division; 160 miles for a juror summoned from Waterloo, Alabama to serve in the Eastern Division; 165 miles for a juror summoned from Mellow Valley, Alabama to serve in the Northwestern Division; and roughly 148 miles for a juror summoned from Wright, Alabama to serve in the Southern Division.

20. Because of these distances, many jurors summoned to serve in divisions outside their home division obviously must stay overnight and often longer, particularly if actually selected to serve on a jury.

21. Nearly a third (32.98%) of the blacks in the Northern District of Alabama live in poverty, while only about twelve percent (11.-78%) of the whites are similarly situated.

22. There is no provision in the Plan for advancing travel costs to impecunious jurors summoned for service outside their divisions.

23. There are no inter-city or inter-division public transportation facilities for the various divisions in the Northern District, other than interstate carriers.

24. Vehicles are unavailable in one-fourth (24.43%) of the black households in the district and in less than ten percent (6.29%) of the white households.

25. Summoned jurors from time to time request and are granted excuses based on the distances involved. These jurors are sometimes recalled for service in their home divisions.

26. Of the 2,437 pending civil cases in the Northern District as of September 14, 1993, 50% were filed in the Southern Division.[14] The Eastern Division accounts for 6% of the pending civil cases; Northwestern—5%; Middle—12%; Northeastern—16%; Jasper—4%; and the Western Division accounts for 7%.

27. The taxpayers would save an undetermined but presumably substantial sum of money if juries are selected by division rather than district-wide in the Northern District of Alabama.

28. Summoning jurors by division would create no administrative problems. In the very hypothetical event that simultaneous jury trials are scheduled in each of the eight courthouses of the district, simultaneously summoning jurors from each division for the trial(s) in that division would pose no administrative hurdle.

*Jury Plans In Other Judicial Districts Of The Eleventh Circuit*

29. In the nine judicial districts of the three states which constitute the Eleventh

---

**13.** Under the Act, "division" means *inter alia:* "one or *more* statutory divisions of a judicial district." 28 U.S.C. § 1869(e) (Supp.1993) (emphasis added).

**14.** This percentage does not include the 4,247 Multi–District Litigation breast implant cases assigned to the Southern Division.

Circuit, only the Northern District of Alabama uses a district wide MJW and QJW in civil cases. Indeed, the *parties and the United States have not pointed to the Court any other judicial district* with statutory divisions *in the entire federal system* which uses a *district-wide QJW* in *civil cases.*[15]

30. The Middle District of Alabama has three statutory divisions. 28 U.S.C. § 81(b) (1993). Its jury plan requires the court to "maintain a separate qualified wheel for each division." IX 9.

31. The Southern District of Alabama has two statutory divisions. 28 U.S.C. § 81(c) (1993). It maintains "a separate qualified wheel for each division." IX 8. The Northern Division of the Southern District, consisting of 83,324 registered voters, has fewer such voters than the smallest of the Northern District of Alabama's divisions. PX 1.

32. The Northern District of Georgia has four statutory divisions. 28 U.S.C. § 90(a) (1993). It maintains a separate MJW and QJW for each of the divisions. IX 10 at 82, 85.

33. The Middle District of Georgia contains seven statutory divisions. 28 U.S.C. § 90(b) (1993).[16] It fills its MJW and QJW by division. IX 31 at 4, 13.

34. The Southern District of Georgia has six statutory divisions. 28 U.S.C. § 90(c) (1993). It maintains a separate MJW and QJW for each division. IX 11 at 190, 194.

35. None of the judicial districts in Florida contain statutory divisions. 28 U.S.C. § 89 (1993). The Northern District of Florida has four non-statutory divisions. IX 13 at 1. Separate MJWs and QJWs are maintained for each division. *Id.* at 8, 14. In the Middle District of Florida, there are five non-statutory divisions. IX 12 at 5. Court is held at eight separate locations. 28 U.S.C. § 89(b) (1993). A separate MJW and QJW is maintained for each division. IX 12 §§ 4.02, 8.02. The Southern District of Florida has two non-statutory divisions, and its

juries are selected by divisions. *See, e.g., United States v. Rodriguez,* 776 F.2d 1509, 1510 (11th Cir.1985); *United States v. Pepe,* 747 F.2d 632, 647, 648 (11th Cir.1984).

### Blacks On Civil Venires and Juries

36. The credible evidence is that on most 18–20 person civil jury panels in the Northern District, there are at most one or two black venirepersons. In many civil jury cases, including cases involving alleged race discrimination, there are no blacks on the panel. The paucity of blacks on civil jury panels enables opposing counsel to use their peremptory challenges to exclude blacks from the petit jury altogether in a substantial number of racial discrimination cases.

37. By way of contrast, the civil juries in Jefferson County Circuit Court reflect a much higher percentage of blacks. Thus, by removing a case from the state court in Jefferson County to the federal court in the same county, a party may likely effect the total exclusion of blacks from the jury which tries the case.

### Statistical Disparities

38. For the district as a whole, there is a 4.2% absolute disparity between blacks on the QJW and blacks of voting age in the district. There is a 3.1% absolute disparity between blacks on the QJW and registered black voters in the district.

39. Based on the racial composition of the voter lists in the Northern District of Alabama, one would expect 2,250 blacks in the present QJW of the district. The occurrence of 1,821 black names in the QJW by random chance is less than one in 10,000. There are more than 7 standard errors in the actual and expected numbers of blacks in the QJW.

40. There is a 13.47% absolute disparity between eligible black voters in the Southern Division and those in the QJW. There is a 13.36% absolute disparity between blacks in

---

**15.** The Eastern District of New York uses both a district-wide wheel and a separate wheel for two (Nassau and Suffolk) of its five counties. There are no statutory divisions in the district. 28 U.S.C. § 112(c) (1993). The district's jury selection plan establishes a Long Island Division (consisting of Nassau and Suffolk counties) "for jury selection purposes." IX 7.

**16.** The Americus Division is now closed.

the QJW and actual black voters in the Southern Division.

41. There is a 15.14% absolute disparity between eligible black voters in the Western Division and blacks in the QJW. There is a 14.68% absolute disparity between actual black voters in the division and blacks in the QJW.

42. In the Eastern Division, there is a 5.48% absolute disparity between eligible black voters and blacks in the QJW. There is a 4.15% absolute disparity between the blacks in the QJW and actual black voters.

43. There is an absolute disparity of less than ten percent between blacks in the QJW and eligible as well as actual black voters in the Northwestern, Northeastern, Middle, and Jasper Divisions.

44. The QJW contains .71% of the eligible white voters and .56% of the eligible black voters in the Northern District of Alabama. Eight-tenths of one-percent (.88%) of the actual white voters and .75% of the actual black voters are included in the QJW.

45. The QJW contains 2.4% of the eligible white voters and 1% of the eligible black voters in the Southern Division of the district. It contains 3% of the actual white voters and 1.4% of the actual black voters in the Southern Division.

46. Seventy-nine percent (79%) of the eligible white population in the Northern District of Alabama is actually registered to vote; while 74% of the eligible black population is actually registered to vote.

*Racial Effects of the Use of Voter Lists Exclusively and the One–Step Procedure*

47. Generally blacks are less likely than whites to respond to questionnaires, particularly when they come from the government. In the one-step procedure utilized by the court, only the questionnaire is sent to prospective jurors. If the questionnaires were accompanied by a summons to report for jury service, the response rates of blacks would significantly increase.

48. The use of voter lists as the sole source for filling the MJW and the QJW is sometimes problematic. Lower-income persons are more likely to move and not leave a forwarding address. Voter registration lists often contain old addresses of voters who have since relocated. Since the per capita income of blacks is lower than that of whites in the district, it is therefore more likely that questionnaires sent to black voters will be returned as undeliverable. The supplementation of voter lists with lists of driver licenses would ameliorate these problems.

49. Hunter Slaton credibly testified to a comparative study by his office of voter lists and driver licenses as source lists for Alabama state jury rolls. Several counties in the State use voter lists exclusively. Other counties use driver license lists exclusively. The study showed that response rate to juror questionnaires in counties using voter lists is forty percent (40%); while the response rate in those using lists of driver licenses is seventy-seven percent (77%).[17]

50. Driver licenses lists by county are just as accessible to the Clerk of the Northern District as voter lists. The computer equipment which currently prepares the MJW and QJW has the capability of incorporating lists of driver licenses with the voter lists, and according to the data processing manager for the MJW and QJW, it would be "a relatively simple matter to do it."

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the claims of the plaintiff and intervenors pursuant to 28 U.S.C. § 1867(c) (Supp.1993).

2. The use of a district-wide master jury wheel and qualified jury wheel in the Northern District of Alabama—where the divisions are demographically diverse, the geographical distances are great, and substantial percentages of black citizens live in poverty and lack vehicular transportation—violates the rights of the plaintiff and intervenors to petit juries selected at random from a cross sec-

---

17. In Alabama, driver licenses must be renewed quadrennially. Voter lists are required by law to be recompiled decennially.

tion of the community in the division wherein the court convenes. 28 U.S.C. § 1861 (Supp. 1993).

3. The use of a district-wide master jury wheel and qualified jury wheel in the Northern District of Alabama disproportionately deprives black citizens of the district the opportunity to be considered for service on petit juries in the district in violation of the policy set forth in 28 U.S.C. § 1861 (Supp. 1993).

4. The use of a district wide master jury wheel and qualified jury wheel in the Northern District of Alabama, covering half of the state and in which eligible black jurors are disproportionately poor and lack vehicular transportation, has the disparate impact of excluding citizens from service as petit jurors on account of race, color, and economic status in violation of 28 U.S.C. § 1862 (Supp.1993).

5. In the Southern and Western Divisions of the Northern District of Alabama, the exclusive use of voter lists as the source of names for the master jury wheel and the qualified jury wheel does not guarantee to litigants in those divisions the right to petit juries selected at random from a fair cross-section of the community in the division wherein the court convenes, as provided by 28 U.S.C. § 1861 (Supp.1993).