United States Court of Appeals,

Eleventh Circuit.

No. 94-6459.

UNITED STATES of America, Plaintiff-Appellee,

v.

Terry Wayne GRISHAM, aka Terry Wayne Girsham, Defendant-Appellant.

Sept. 12, 1995.

Appeal from the United States District Court for the Northern District of Alabama. (No. CR-93-N-170-S), Edwin L. Nelson, Judge.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and JOHNSON, Senior Circuit Judge.

JOHNSON, Senior Circuit Judge:

Terry Wayne Grisham appeals his conviction for bank robbery. The issue presented in this appeal is whether the Northern District of Alabama's ("the Northern District") practice of selecting juries from the district at large violates the Fifth and Sixth Amendments of the Constitution merely because of the disparity between the percentage of African-Americans on the qualified jury wheels created from voter registration lists of the district at large and the percentage of African-Americans in the population of the Southern Division of the Northern District ("the Southern Division").[1] Because we conclude that it does not, we affirm

_____

[1]Grisham also contends that a prosecution witness' in-court identification of him violated the Due Process Clause of the Fifth Amendment. Assuming for the sake of argument that the in-court identification violated due process, Grisham's contention is not a sufficient ground for reversal of his conviction. The admission of unreliable identifications is subject to harmless error analysis. *Marsden v. Moore,* 847 F.2d 1536, 1546 (11th Cir.), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988). After reviewing the overwhelming evidence against Grisham, we are left with no doubt that the jury

Grisham's conviction.

## I. STATEMENT OF THE CASE

In July 1993, Terry Wayne Grisham was indicted on one count of bank robbery, in violation of 18 U.S.C.A. § 2113(a) (West 1984 & Supp.1995). The case was initially set for trial on October 5, 1993. Following voir dire, Grisham moved to strike the jury panel "because of the inadequate representation of persons of the minority race." The district court continued the trial to permit defense counsel to file a formal challenge to the jury selection procedures of the Northern District and consolidated the hearing on Grisham's motion with a similar challenge raised by defendants in an unrelated criminal action.[2]

Grisham subsequently filed written motions challenging the methods and procedures for selecting jurors for grand and petit juries in the Northern District. Grisham contended that the selection procedures disproportionately excluded African-Americans from jury service, in violation of (1) the Jury Selection and Service Act of 1968 ("the Act"), 28 U.S.C.A. § 1861, *et seq.* (West 1994), which provides that "all litigants shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes," (2) his Sixth Amendment right to a jury pool composed of a fair cross-section of the community, and (3) the Fifth Amendment rights of jurors to equal protection under the law. After

would have convicted him even absent the purportedly unreliable in-court identification.

[2]The caption for the other case is *United States v. Stutson, et al.,* CR-93-N-1052-S.

conducting an evidentiary hearing, the district court ruled that Grisham's statutory challenge was untimely, [3] and rejected his constitutional claims on the merits. At the conclusion of a jury trial, Grisham was convicted on one count of bank robbery. The district court sentenced him to 225 months' imprisonment.

## II. ANALYSIS

Challenges to the jury selection process may be based on the fair cross-section requirement of the Sixth Amendment, *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the equal protection component of the Fifth Amendment, *Cunningham v. Zant,* 928 F.2d 1006 (11th Cir.1991), or a substantial failure to comply with the provisions of the Act. *United States v. Maskeny,* 609 F.2d 183, 191 (5th Cir.), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). Because Grisham concedes that the district court correctly concluded that his statutory claim was untimely, only the constitutional issues are before us on appeal. We review *de novo* constitutional challenges to jury selection processes. *See, e.g., United States v. Rodriguez,* 776 F.2d 1509, 1511 (11th Cir.1985) (conducting *de novo* review); *United States v. Tuttle,* 729 F.2d 1325, 1327 (11th Cir.1984) (same), *cert. denied,* 469 U.S. 1192, 105 S.Ct. 968, 83 L.Ed.2d 972 (1985).

A. The Northern District's Jury Selection Process

At issue in this action are two separate jury selection plans

[3]The Act provides that, in criminal cases, challenges to the jury selection process under the Act must be brought "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." 28 U.S.C.A. § 1867(a) (West 1994).

adopted by the Northern District pursuant to provisions of the Act. The grand jury that indicted Grisham was selected pursuant to a plan adopted by the district court in March 1989. The petit jury that tried Grisham was selected pursuant to a plan which went into effect in October 1993. The methods and procedures of these two plans ("the plans") are substantially identical.

The Northern District is divided into seven statutory divisions. 28 U.S.C.A. § 81(a) (West 1994). Pursuant to the plans, which were adopted by all of the judges of the United States District Court for the Northern District and approved by a panel of the judicial council of the United States Court of Appeals for the Eleventh Circuit, the district court selects juries on a district-wide basis, as opposed to a division-wide basis.

As required by the plans, the clerk of the district court has established a master jury wheel ("MJW"), drawn by random selection from lists of registered voters from each county in the district. Periodically, as provided in the plans and in 28 U.S.C.A. § 1864(a), the clerk randomly selects names from the MJW and mails a juror questionnaire to each person selected. Returned questionnaires are examined to determine which persons are qualified for jury service and not exempt or due to be excused. Those persons are placed on the qualified jury wheel ("QJW"). The criteria for determining juror qualifications, exemptions, and excuses are set forth in the plans. Only those questionnaires which are returned are utilized; the clerk does not follow up or contact persons who fail to return questionnaires. Nor does the clerk follow up on questionnaires that are returned by the post

office as undeliverable.

At the time of Grisham's grand jury proceeding, the clerk sent 24,000 questionnaires to persons randomly selected from the MJW. Of those 24,000 questionnaires, 5,479 were returned as undeliverable, 3,135 elicited no responses, and more than 5,000 persons were properly excused from service. Eventually, the QJW was composed of 9,188 persons, of which 15.9% were African-American.

At the time of Grisham's trial, the clerk placed 37,000 names on the MJW. Questionnaires were mailed to 8,076 persons randomly selected from the MJW. Of those 8,076 questionnaires, 1,123 were returned as undeliverable, 1,175 were not returned, and approximately 1,400 persons were excused. The QJW comprised 4,359 persons, of which 13.59% were African-American.

The percentage of the population of the Northern District eligible for jury service that is African-American is 18.31%. In contrast, 28.98% of the population of the Southern Division eligible for jury service is African-American.

B. The Sixth Amendment

The Sixth Amendment guarantees a criminal defendant the right to be indicted and tried by juries drawn from a fair cross-section of the community. *Duren,* 439 U.S. at 359, 99 S.Ct. at 666; *Taylor v. Louisiana,* 419 U.S. 522, 526-31, 95 S.Ct. 692, 695-98, 42 L.Ed.2d 690 (1975); *Cunningham,* 928 F.2d at 1013. As the Supreme Court explained in *Holland v. Illinois,* the fair cross-section requirement is "not explicit in the text" of the Sixth Amendment, "but is derived from the traditional understanding of how an

"impartial jury' is assembled. That traditional understanding includes a representative venire, so that the jury will be ... "drawn *from* a fair cross section of the community.' " 493 U.S. 474, 480, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990) (*quoting Taylor,* 419 U.S. at 527, 95 S.Ct. at 696) (emphasis in original). The representativeness requirement serves the goal of impartiality because it prevents the government from drawing up "jury lists in such manner as to produce a pool of prospective jurors disproportionately ill disposed towards one or all classes of defendants." *Id.*

To establish a prima facie case that a jury selection process does not produce a fair cross-section of the community, a defendant must show (1) that the group alleged to be excluded is a distinctive group in the community, (2) that representation of the group in venires is not fair and reasonable in relation to the number of such persons in the community, and (3) that the underrepresentation is due to systemic exclusion of the group in the jury-selection process. *Duren,* 493 U.S. at 364, 110 S.Ct. at 680. The government concedes that Grisham has satisfied the first element of his prima facie case, but maintains that he fails both the second and third elements. Because we conclude that Grisham fails the second element, we limit our discussion to that issue. *See United States v. Pepe,* 747 F.2d 632, 649 (11th Cir.1984) (failure on any element of the prima facie case ends a challenge under the Sixth Amendment).

To examine the second element, we must compare the difference between the percentage of the distinctive group among the

population eligible for jury service and the percentage of the distinctive group on the QJW.  *Pepe,* 747 F.2d at 649;  *United States v. Esle,* 743 F.2d 1465, 1479-80 n. 3 (11th Cir.1984) (Tjoflat, J., concurring).  If the absolute disparity between these two percentages is 10 percent or less, the second element is not satisfied.  *Rodriguez,* 776 F.2d at 1511;  *Tuttle,* 729 F.2d at 1327.[4]

Here, if the relevant community to be compared with the QJW is the Northern District, then the absolute disparity in the context of both Grisham's grand and petit juries is substantially less than 10 percent.  The percentage of African-Americans among the population of the Northern District eligible for jury service was 18.31%, whereas the percentage of African-Americans on the grand jury QJW was 15.9% and on the petit jury QJW was 13.59%.

Grisham contends, however, that the relevant community to be compared with the QJWs is not the Northern District, but the Southern Division.  If that is correct, he may satisfy the second element because the disparity between the 28.98% African-American population of the Southern Division eligible for jury service and the 15.9% and 13.59% African-American composition of the QJW for Grisham's grand and petit juries is greater than 10 percent. [5]

---

[4]To the extent that Grisham is requesting this panel to overrule the 10 percent absolute disparity requirement, we are without power to do so.  *See United States v. Machado,* 804 F.2d 1537, 1543 (11th Cir.1986) (only the Supreme Court or the Eleventh Circuit sitting en banc can overrule the decision of a prior panel).  *See also, Maskeny,* 609 F.2d at 190 (declining to examine methods other than absolute disparity).

[5]The government contends that even if the population of the Southern Division is used as the relevant community, the 10 percent threshold is not met.  To reach this conclusion, the

Grisham advances two bases for his position: (1) that the community contemplated by the Sixth Amendment's fair cross-section requirement is smaller than the district at large, and (2) that Congress has defined the relevant community as the Southern Division.

### 1. The meaning of "community"

In this Circuit's prior cases, we have not had occasion to define the meaning of "community" in the context of challenges to federal jury selection systems. The prior cases simply called for a comparison between the racial composition of the community from which the district court drew the jury wheel and the racial composition of the jury wheel. *See, e.g., Pepe,* 747 F.2d at 649; *Gibson v. Zant,* 705 F.2d 1543, 1547 (11th Cir.1983). We must, therefore, decide for the first time what geographical parameters the fair cross-section requirement, which is implicit in the Sixth Amendment, imposes on the selection of jurors.

The geographical parameters of the source of the jury is not a subject about which the Sixth Amendment is silent. The Sixth Amendment provides that criminal defendants are entitled to trial "by an impartial jury of the State and *district* wherein the crime shall have been committed, *which district shall have been previously ascertained by law.*" (emphasis added). This provision

---

government would have us compare the percentage of African-Americans in the eligible population of the Southern Division (28.98%) with the percentage of persons from the Southern Division on the QJW who are African-American (19.96%). However, the fact that 19.96% of persons from the Southern Division on the QJW are African-American is irrelevant. The fact remains that African-Americans comprise only 15.9% and 13.59% of the jury pools from which Grisham's grand and petit juries were drawn.

of the Sixth Amendment is known as the vicinage provision. At common law, a criminal defendant was entitled to a jury drawn from the locality of the crime, usually an English county. *See* Drew L. Kershen, *Vicinage,* 29 Okla.L.Rev. 801, 813-16 (1976). In considering amendments to the Constitution, Congress debated whether to provide a guarantee to federal criminal defendants regarding vicinage. Those in favor of a vicinage provision sought narrow territorial limits akin to those existing at common law. *Id.* at 816-44. The text of the Sixth Amendment represents a compromise: a constraint on the source of the jury was constitutionalized, but the size of the vicinage was left to Congressional determination. *See Williams v. Florida,* 399 U.S. 78, 96, 90 S.Ct. 1893, 1903-04, 26 L.Ed.2d 446 (1970). As this Court has previously observed, "[i]t was apparently understood that the districts mentioned in the amendment would be defined by Congress in the Judiciary Act, which was pending while the amendments were being debated." *United States v. Louwsma,* 970 F.2d 797, 801 (11th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1383, 122 L.Ed.2d 759 (1993). Thus, neither the language of the vicinage provision nor its legislative history suggests that the geographical area from which the jury is summoned must be smaller than the judicial district created by Congress.

Furthermore, binding precedent interpreting the vicinage provision makes it clear that the Sixth Amendment provides Congress and the courts flexibility in selecting the source of the jury pool. For example, the United States Supreme Court has held that the Sixth Amendment does not require that the jury drawn be from

the *whole* district. *Ruthenberg v. United States,* 245 U.S. 480, 482, 38 S.Ct. 168, 169, 62 L.Ed. 414 (1918) (the plain language of the Sixth Amendment is satisfied by a jury drawn from a geographical subdivision of a judicial district). Additionally, as interpreted by the former Fifth Circuit, the vicinage provision does not require that *any* jurors reside in the immediate vicinity of the occurrence of the crime. *See United States v. James,* 528 F.2d 999, 1021 (5th Cir.) (the Sixth Amendment does not entitle a criminal defendant to trial in the division where the crime was committed even though the division in which the trial is conducted selects its juries only from division-based voting lists), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). *See also United States v. Grayson,* 416 F.2d 1073, 1076 (5th Cir.1969) (no right to be indicted in the division where the offense occurred), *cert. denied,* 396 U.S. 1059, 90 S.Ct. 754, 24 L.Ed.2d 753 (1970). Thus, on the basis of the text of the vicinage provision, its legislative history, and the caselaw interpreting it, we conclude that district-based jury selection comports with the vicinage provision of the Sixth Amendment.

Grisham's contention to the contrary is somewhat extraordinary. He suggests that the fair cross-section requirement mandates that we graft onto the Sixth Amendment a more restrictive definition of community than the definition that is expressly provided in the Sixth Amendment itself. We disagree.

As noted above, the fair cross-section requirement is a means of ensuring that the Sixth Amendment's guarantee of an impartial jury is met. *Holland,* 493 U.S. at 480, 110 S.Ct. at 807. A

representative jury pool serves this goal because a diversity of viewpoints among the jury pool hedges against the possibility of a jury acting on prejudices shared by a homogenous group. *Id.* Understanding "community" for the purposes of a federal criminal defendant's fair cross-section claim to be the same as the parameters set forth in the Sixth Amendment's vicinage provision is consistent with the goal of impartiality. The QJWs in the Northern District include the full range of racial, social, and economic diversity in the region. So long as the lines of the geographical area from which the jury wheel is compiled are not drawn for the purpose of racial gerrymandering, *see United States v. Cannady,* 54 F.3d 544 (9th Cir.1995) (use of division-based jury wheels is proper absent evidence of gerrymandering), selecting juries at random from a predetermined geographical area provides a sufficiently diverse jury pool to ensure impartiality.

Impartiality may, in fact, be *better* served by juries drawn from areas not in close proximity to the crime. One of James Madison's principal arguments against incorporating a common law vicinage requirement was that the sympathy of local citizens with the perpetrator of an offense against the federal government would render successful prosecution impossible. *See* Kershen *supra* at 841 (discussing Madison's view). We need look no further than local prosecutions during the civil rights movement to witness Madison's acuity. Moreover, local prejudice may be aimed at the defendant instead of the government, as, for example, where the locality seeks retribution for an injury suffered by a popular victim. Accordingly, we hold that the Sixth Amendment does not entitle a

federal criminal defendant to a jury summoned from a fair cross-section of the community immediately surrounding the place of the crime, but merely to a jury drawn from a fair cross-section of some previously defined geographical area within the boundaries of the judicial district in which the offense occurred.

## 2. Congressional designation of divisions

Grisham next contends that the creation of judicial divisions in the Northern District signals Congress' intention that juries be selected on the basis of those divisions.[6] As we noted above, the Sixth Amendment gives Congress the power to determine the area of the vicinage district under the Sixth Amendment. Thus, Congress could create a system whereby statutes refer to "districts" for certain purposes, such as jurisdiction and venue, and, at the same time, mark off distinct geographical areas for the purpose of creating Sixth Amendment vicinage districts.

Nonetheless, we reject Grisham's contention that Congress' creation of judicial divisions was an exercise of this Sixth Amendment power. First, it is significant that Congress did not express such an intention in the most obvious manner available to it, namely, by using the term "district." Second, neither the statute creating the statutory divisions of the Northern District nor the Act expressly dictates a division-based vicinage

---

[6]We note, however, that if Grisham is correct, the plans would violate the Sixth Amendment not because they failed to represent a fair cross-section of the community, but rather because they failed to draw the jury from within the Sixth Amendment "district" as defined by Congress. Thus, Grisham's statistics regarding racial composition are irrelevant to this issue.

requirement.[7]   The Act does not stipulate which political subdivision within a district the federal courts should select, committing that decision to the courts' discretion.  28 U.S.C.A. § 1861;  28 U.S.C.A. § 1863(b)(2) ( [A] jury selection plan shall "specify whether the names of prospective jurors shall be selected from the voter registrations lists or the lists of actual voters of the political subdivisions within the *district or division.*") (emphasis added).   Third, Grisham has failed to point to any legislative history which supports his contention that Congress intended to require division-based jury selection.   Thus, we conclude that, in creating divisions within the Northern District, Congress did not exercise its power to define the geographical limits from which a federal jury may be drawn. *See Clement v. United States,* 149 F. 305, 309-10 (8th Cir.1906) (ruling that divisions are not districts under the Sixth Amendment), *cert. denied,* 206 U.S. 562, 27 S.Ct. 795, 51 L.Ed. 1189 (1907).

Accordingly, the district court did not err in concluding that, in this case, the relevant statistical community was the Northern District rather than the Southern Division and, thus, properly rejected Grisham's Sixth Amendment claim.

C. Equal Protection

To establish an equal protection violation in the jury selection context, a defendant must show "(1) that he or she is a member of a group capable of being singled out for discriminatory

---

[7]It is noteworthy that Congress has in the past enacted statutes creating judicial divisions that contained explicit division-based vicinage requirements. *See* Kershen *supra* at 61-65.

treatment, (2) that members of this group were substantially underrepresented on the venire, and (3) that the venire was selected under a practice providing an opportunity for discrimination." *Cunningham,* 928 F.2d at 1013. Although the prima facie case for an equal protection claim resembles the elements of a fair cross-section claim, the purpose of an equal protection claim is to determine whether the disparity in the jury venire is the result of a discriminatory purpose. *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26. Thus, whereas the inquiry in a fair cross-section claim focuses on the representativeness of the jury venire, the focus of an equal protection claim is whether members of a discrete group have been intentionally denied the opportunity to serve on a jury. If the defendant makes his prima facie case, the burden shifts to the government to dispel the inference of intentional discrimination. *Castaneda v. Partida,* 430 U.S. 482, 497-98, 97 S.Ct. 1272, 1281-82, 51 L.Ed.2d 498 (1977); *see also Gibson,* 705 F.2d at 1546. If the government provides a legitimate explanation, the ultimate burden of proving discriminatory intent rests on the defendant challenging the jury selection process. *Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986).

Grisham contends that the district-based selection process excludes African-Americans residing in the Southern Division from jury service as evidenced by the disparity between the QJWs and the population of the Southern Division.[8] As Grisham relies solely on

[8]Grisham also contends that the clerk's failure to pursue unreturned and undeliverable jury questionnaires has the effect of excluding African-Americans residing outside of the Southern

the evidence of disparity, the narrow issue before us is whether this statistical evidence was sufficient by itself to permit an inference of discriminatory purpose behind the plans.

The district court resolved this issue on the ground that cross-community statistical comparisons are *irrelevant* for equal protection analysis.[9]  However, we need not decide whether a cross-community statistical disparity *by itself* may ever serve as sufficient evidence to infer discrimination, for the statistical disparity presented in this case is not sufficient to carry Grisham's ultimate burden.[10]  The Northern District has adopted the Southern Division as the preferred venue for criminal trials for purposes of administrative convenience and providing criminal

Division from jury service.  Grisham, however, has not produced any evidence to indicate that African-Americans are disproportionately affected by the clerk's failure to follow up on questionnaires.

[9]The district court stated:

> [Intent to discriminate] cannot be inferred merely from defendants showing a disparity between the percentage of black jurors on the qualified wheel and the percentage of black persons eligible for jury service in a *hypothetical* community.  There almost always will be a disparity between the percentage of black jurors on the wheel and the percentage of jury-eligible black persons in the population of any "community" which is not the community from which the wheel was drawn.  That is not, and cannot be, the test of an equal protection question.  Since the defendants are not entitled to trial in a self-defined community, which includes only the division in which the crime occurred, they are not entitled to compare their venire with that community for equal protection purposes.

*Grisham,* 841 F.Supp. at 1146.

[10]The disparity between the African-American population of the Southern Division eligible for jury service and the African-American composition of the QJW for Grisham's grand and petit juries is approximately 13% and 15.5%, respectively.

defendants with a speedy trial. If the Northern District selected juries only from the area used to determine the venue of trial, the consequence would be that residents of the Northern District outside the Southern Division would be precluded from serving on federal criminal juries. Thus, district-based selection in this case ensures that all residents of the Northern District have a realistic chance of serving as jurors. In light of this governmental interest, the Northern District's decision to adopt district-based jury selection is eminently reasonable. The resulting 13% and 15.5% absolute "cross-community" disparities are simply not sufficient to support an inference that the Northern District has acted for an illicit purpose. Accordingly, we conclude that the district court properly rejected Grisham's equal protection challenge to the plans.

### III. CONCLUSION

For the reasons stated above, we AFFIRM.[11]

---

[11]We recognize that Judge Clemon follows a modified version of the Northern District's jury selection plan in civil cases arising in two divisions. *Hardin v. City of Gadsden,* 837 F.Supp. 1113 (N.D.Ala.1993). Judge Clemon adopted the modifications on the basis of his conclusion that the jury selection plans at issue in this case violated the Act, a question which is not presented by this case. Moreover, the district court in *Hardin* relied on findings concerning the disproportionate poverty of African-Americans in Northern Alabama and their lack of access to transportation. These facts have not been presented to us in this appeal. Thus, our conclusion today should not be viewed as resolving, one way or the other, the issues that were before Judge Clemon in *Hardin.*