Kevin PRINCE, Petitioner,

v.

Al C. PARKE, Superintendent, Indiana State Prison, and Indiana Attorney General, Pamela Carter, Respondents.

No. 3:95cv0499 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Oct. 18, 1995.

1244

Kevin Prince, Michigan City, IN, Pro Se.

Randall Koester, Office of Indiana Attorney General, Indianapolis, IN, for Respondents.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

On June 15, 1995, *pro se* petitioner Kevin Prince, an inmate at the Indiana State Prison, Michigan City, Indiana, filed a petition seeking relief under 28 U.S.C. § 2254. The response filed by the respondents on August 15, 1995, demonstrates the necessary compliance with *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir.1982). The petitioner filed a Traverse and Memorandum on August 28, 1995, which this court has carefully examined. The state court record has been filed and examined pursuant to the mandates of *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

The petitioner was convicted of the crime of murder in a jury trial in the St. Joseph Superior Court in South Bend, Indiana. Judge William T. Means sentenced the petitioner to a prison term of 40 years in 1992. A direct appeal was taken to the Third District of the Court of Appeals of Indiana. That court, speaking through Judge Garrard in an unpublished memorandum decision, affirmed the aforesaid conviction in an elaborate, nine-page opinion in which Judges Hoffman and Shields concurred. For the immediate reference of all concerned, the court's memorandum decision of June 24, 1994, is marked as Appendix "A", attached hereto and incorporated herein. The Supreme Court of Indiana denied transfer. A facial examination of Judge Garrard's excellent opinion will clearly indicate the factual setting of this case and satisfy the factual predicate demanded by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Certainly, the facts found by the Court of Appeals of Indiana can and should be presumed to be correct under 28 U.S.C. § 2254(b). Justice Stewart, speaking for the Supreme Court of the United States in *Jackson*, stated:

A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law. The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. See 28 U.S.C. § 2254(b), (d). What it does not presume is that these state proceedings will always be without error in the constitutional sense. The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the "finality" of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right—is not one that can be so lightly abjured.

*Jackson*, 443 U.S. at 323, 99 S.Ct. at 2791. The Supreme Court in *Jackson* stated:

We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

*Id.* at 324, 99 S.Ct. at 2791–92 (footnote omitted). *See also Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Dooley v. Duckworth*, 832 F.2d 445 (7th Cir.1987), *cert. denied*, 485 U.S. 967, 108 S.Ct. 1239, 99 L.Ed.2d 438 (1988); *United States ex rel. Haywood v. O'Leary*, 827 F.2d 52 (7th Cir.1987); *Bryan v. Warden, Indiana State Reformatory*, 820 F.2d 217 (7th Cir.), *cert. denied*, 484 U.S. 867, 108 S.Ct. 190, 98 L.Ed.2d 142 (1987); *Shepard v. Lane*, 818 F.2d 615 (7th Cir.), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987); *Perri v. Director, Dep't of Corrections*, 817 F.2d 448 (7th Cir.), *cert. denied*, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987). Following *Jackson, supra,* there is an increasingly long line of cases in this circuit which suggest that the facts found by the highest court of a state are presumed correct. *See Andersen v.*

**1246**

*Thieret,* 903 F.2d 526, 531 (7th Cir.1990). A review of the record in the light most favorable to the prosecution convinces the court that a rational trier of fact could readily have found the petitioner guilty, beyond a reasonable doubt, of murder.

### DISCUSSION

The petitioner, an African–American, challenges the racial imbalance of the jury venire and that the same violated his Sixth and Fourteenth Amendment rights under the Constitution of the United States. The fifty-member jury venire which was available for jury selection in this petitioner's trial in the Superior Court of St. Joseph County had a single African–American person. In attempting to extrapolate this into a constitutional violation as in such cases as *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), *Holland v. Illinois,* 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), and *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the petitioner argues that the St. Joseph County system of calling jurors solely from the voter registration lists systematically underrepresents African–Americans and, thus, deprived him of his right to be tried by a jury drawn from a fair cross-section of the community.[1] This court disagrees.

### A. Fair Cross–Section

■■■■ Under the Sixth Amendment to the Constitution, a defendant accused of a serious crime has the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. CONST. amend. VI. The Supreme Court has interpreted this provision to mean that the venire from which a criminal defendant's jury is chosen must be selected from a representative cross-section of the community. *Taylor,* 419 U.S. at 528, 95 S.Ct. at 696–97; *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968); *United States v. Guy,* 924 F.2d 702, 706 (7th Cir.1991). The Sixth Amendment requirement of a jury drawn from a fair cross-section of the community is made binding upon the states through the Due Process Clause of the Fourteenth Amendment. *Duncan,* 391 U.S. at 159, 88 S.Ct. at 1452–53. In order to establish a *prima facie* violation of the Sixth Amendment's fair cross-section requirement, the defendant must show

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren,* 439 U.S. at 364, 99 S.Ct. at 668; *see also Bradley v. State,* 649 N.E.2d 100, 104 (Ind.1995). Unlike in the context of an equal protection claim, where the defendant must prove purposeful discrimination, *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), "systematic disproportion itself demonstrates an infringement of the defendant's interest in … a fair community cross section." *Duren,* 439 U.S. at 368 n. 26, 99 S.Ct. at 670 n. 26. Once the defendant has made a *prima facie* showing that his constitutional right to a jury drawn from a fair cross-section of the community has been infringed, the burden shifts to the State to demonstrate that a significant state inter-

---

**1.** In addition to his constitutional claim, the petitioner also contends that the St. Joseph County jury selection process "may not be random as required by Indiana Code 33–4–5–2(c)." Petitioner's Memorandum at 4. While federal courts are constrained to address only constitutional claims on § 2254 petitions, this court notes that a recent decision by the Supreme Court of Indiana appears to have dealt dispositively with the very statutory issue the petitioner raises here. In *Bradley v. State,* 649 N.E.2d 100 (Ind.1995), the court concluded that "the computerized selection of potential jurors from voter registration lists alone, without the additional use of tax lists, is adequate to satisfy the statutory require-

ments." *Id.* at 103. Thus, notwithstanding the petitioner's claim that "[t]here are heavier minority concentrations in certain areas of the county, and the computer selection system employed by St. Joseph County does limit the number of prospective jurors which [sic] may be called from any one area in the county," Petitioner's Memorandum at 4, the supreme court's decision in *Bradley* does not appear to *require* additional efforts to supplement the voter registration lists in order to meet the requirements of Indiana Code § 33–4–5–2, even where the use of voter registration lists alone results in some groups being underrepresented on jury venires.

est is "manifestly and primarily" advanced by those aspects of the selection process which result in a disproportionate exclusion of the distinctive group. *Duren,* 439 U.S. at 367–68, 99 S.Ct. at 670; *Bradley,* 649 N.E.2d at 104. The State may not advance merely rational grounds for the underrepresentation of the distinctive group. *Duren,* 439 U.S. at 367.

■ As noted above, the petitioner contends that African–Americans are systematically excluded by St. Joseph County's jury selection system. Clearly, African–Americans constitute a distinctive group for purposes of the first part of the *Duren* test, *United States v. Ashley,* 54 F.3d 311, 313 (7th Cir.), *cert. denied,* — U.S. —, 116 S.Ct. 232, 133 L.Ed.2d 161 (1995); *see Lockhart v. McCree,* 476 U.S. 162, 175, 106 S.Ct. 1758, 1765–66, 90 L.Ed.2d 137 (1986), and the State does not here dispute that fact. Rather, the State contends that the petitioner has failed to establish the second and third elements of the *Duren* test. The court notes that at one point in his argument, the petitioner attempts to expand the definition of the distinctive group claimed to be excluded to encompass "minorities" in general. Petitioner's Memorandum at 2. The petitioner presents no authority for his argument that "minorities" should be recognized as a separate ethnic group for purposes of the fair cross-section requirement. This court does not understand the requirement of a distinctive group under *Duren* to allow various groups to be 'lumped' together into one distinctive group called "minorities." Any group of persons which might casually be referred to as "minorities" would have no internal cohesion, nor would it be viewed as an identifiable group by the population at large. In *Taylor v. Louisiana,* the Supreme Court concluded that females constitute a distinctive group because " 'a community made up exclusively of one [sex] is different from a community composed of both.' " 419 U.S. at 531, 95 S.Ct. at 698 (alteration added) (quoting *Ballard v. United States,* 329 U.S. 187, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946)). Following the logic of *Taylor,* if one assumes that a community populated solely by African–Americans is different from a community composed of both African–Ameri-

cans and, for example, Hispanics, then a claim that *African–Americans* are unconstitutionally excluded from jury venires is a claim distinct from one which alleges that *minorities* are unconstitutionally excluded.

■ Regardless of whether "minorities" in general may constitute a distinctive group for purposes of the *Duren* test, the petitioner failed to raise the underrepresentation of "minorities" at the state level in the context of a distinctive group—his claim there was that the St. Joseph County jury selection process unconstitutionally excludes "African–Americans." *See Prince v. State,* No. 71A03–9211–CR–384, 629 N.E.2d 287 (Ind. Ct.App. Jan. 27, 1994) (unpublished memorandum decision) at 2. Because the petitioner did not give the state court a full and fair opportunity to consider a claim that "minorities" are unconstitutionally excluded in the St. Joseph County jury selection process, he therefore has waived consideration of the issue in federal court. *Jones v. Washington,* 15 F.3d 671, 674 (7th Cir.) ("The state courts must have a fair opportunity to consider the petitioner's constitutional claims before the federal courts may address those claims."), *cert. denied,* — U.S. —, 114 S.Ct. 2753, 129 L.Ed.2d 870 (1994). In *Jones,* the Court of Appeals for Seventh Circuit held that "[f]ailure to appeal claims in state postconviction proceedings will result in procedural default of those claims unless [the petitioner] can show cause and prejudice." 15 F.3d at 675. However, because the petitioner's federal claim here is still one of systematic exclusion in violation of the Sixth and Fourteenth Amendments, the court will not procedurally default the petitioner's claim, nor will it review the petitioner's claim for evidence of cause and prejudice. *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977); *Jones,* 15 F.3d at 675. Instead, the petitioner's claim must rise or fall on the basis of his argument that St. Joseph County's selection process unconstitutionally excludes *African–Americans.* Accordingly, the petitioner's attempt to fashion a distinctive group called "minorities" in his § 2254 petition is untenable.

■ The second element of the *Duren* test requires the defendant to show that the representation of the distinctive group on venires from which jury panels are selected is not fair and reasonable in relation to the number of such persons in the community. *Duren,* 439 U.S. at 364, 99 S.Ct. at 668–69. In the present case, the petitioner and the State agree that one African–American out of the fifty venire persons available for impanelment as jurors in the petitioner's trial is below the proportional representation of African–Americans in St. Joseph County. The court takes judicial notice that in the 1990 census, African–Americans numbered 24,190 out of St. Joseph County's population of 247,-052. Clearly, the proportional representation of African–Americans on the petitioner's venire (2%) is below that found in St. Joseph County on the whole (9.8%). However, the disparity fails to establish that African–American representation on the petitioner's venire was not fair and reasonable in relation to the number of African–Americans in the community.

In *Duren v. Missouri,* the defendant argued that provisions of a Missouri law which granted women an automatic exemption from jury service upon request effectively deprived him of his constitutional right to trial by a jury chosen from a fair cross-section of the community. 439 U.S. at 360, 99 S.Ct. at 666–67. The defendant established that although women constituted 54% of the adult population in the county, only 14.5% of those on weekly post-summons jury venires during the period when the defendant's jury was chosen were women. *Id.* at 362, 99 S.Ct. at

667–68. The Supreme Court concluded from the evidence that "[s]uch a gross discrepancy between the percentage of women in jury venires and the percentage of women in the community requires the conclusion that women were not fairly represented in the source from which petit juries were drawn in [the county]." *Id.* at 366, 99 S.Ct. at 669. In this petitioner's case, the evidence reveals a much smaller disparity (7.8%) between the number of the distinctive group in the community and those available for jury service in the jury venire.

Under current Seventh Circuit case law, the disparity alleged by the petitioner is not sufficient to sustain a claim that he has been denied his right to a trial by a fair cross-section of the community. In *United States v. Ashley,* 54 F.3d 311 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 232, 133 L.Ed.2d 161 (1995), wherein the defendants showed an absolute disparity[2] of three percent between the population of the relevant community and the percentage of African–Americans on the jury venire,[3] the Seventh Circuit noted that "a discrepancy of less than ten percent alone is not enough to demonstrate unfair or unreasonable representation of blacks on the venire." 54 F.3d at 314. The court's holding in *Ashley* comports well with earlier Seventh Circuit case law. In *United States v. McAnderson,* 914 F.2d 934 (7th Cir.1990), *cert. denied sub nom. Cranshaw v. United States,* —— U.S. ——, 115 S.Ct. 372, 130 L.Ed.2d 323 (1994), wherein the defendants showed that African–American representation on the jury venire numbered eight percentage points less than that

2. "Absolute disparity" is determined by calculating the difference between the percentage of a distinctive population group eligible for jury duty and the percentage of that group ultimately appearing on the jury venire. By contrast, "comparative disparity," which has been used on occasion in other circuits, is determined by dividing the absolute disparity percentage by the percentage of the distinctive group in the total population. "[Comparative disparity] measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur v. Beyer,* 983 F.2d 1215, 1231–32 (3d Cir.1992). The comparative disparity analysis is generally disfavored because it tends to exaggerate the significance of any deviation. *United States v. Sanchez–Lopez,* 879 F.2d 541, 548 (9th

Cir.1989); *United States v. Pepe,* 747 F.2d 632, 649 n. 18 (11th Cir.1984); *United States v. Suttiswad,* 696 F.2d 645, 648–49 (9th Cir.1982); *United States v. Kleifgen,* 557 F.2d 1293, 1297 (9th Cir.1977). Because the Seventh Circuit has consistently employed the absolute disparity test rather than the minority-view comparative disparity analysis, this court will not review the petitioner's claim under the comparative disparity test.

3. While African–Americans constituted 3% of the voting-age population in the twenty-seven counties that provided jurors for the district court in *Ashley,* the defendant's venire had no African–American members. 54 F.3d at 313.

group's proportional population in the district, the Seventh Circuit stated, "We have never held that such a *de minimis* disparity amounts to an unfair or unreasonable representation of any 'distinctive group.'" 914 F.2d at 941; *see also Swain v. Alabama,* 380 U.S. 202, 208–09, 85 S.Ct. 824, 829–30, 13 L.Ed.2d 759 (1965) (holding that in the equal protection context, a discrepancy of as much as ten percent, standing alone, cannot support a claim of underrepresentation of an identifiable group).

Other circuits have interpreted the fair cross-section requirement of the Sixth Amendment in accordance with the Seventh Circuit's view. In the recent Eleventh Circuit case of *United States v. Grisham,* 63 F.3d 1074 (11th Cir.1995), Senior Circuit Judge Frank M. Johnson, Jr., writing for the court, noted that under *Duren,* "[i]f the absolute disparity between [the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group on the venire] is 10 percent or less, the second element is not satisfied." 63 F.3d at 1078–79; *see also United States v. Rodriguez,* 776 F.2d 1509, 1511 (11th Cir. 1985) ("Although precise mathematical standards are not possible, this circuit has consistently found that a prima facie case of underrepresentation has not been made where the absolute disparity between these percentages does not exceed ten percent.") (finding absolute disparity of 6.674% not unfair); *United States v. Tuttle,* 729 F.2d 1325, 1327 (11th Cir.1984) ("This circuit has consistently required an absolute disparity of over 10% between the underrepresented group's proportion of the general or age-eligible population and its representation on the venire before a prima facie case is established.") (finding absolute disparity of 6.33% not unfair), *cert. denied,* 469 U.S. 1192, 105 S.Ct. 968, 83 L.Ed.2d 972 (1985).

Although some circuits have not expressly adopted the ten percent absolute disparity benchmark used by the Seventh and Eleventh Circuits to determine constitutional significance, case law indicates that absolute disparities of the degree alleged here (7.8%) are not recognized by other courts as evidence of unconstitutional underrepresentation. In *United States v. Butler,* 611 F.2d 1066 (5th Cir.), *cert. denied sub nom. Fazio v. United States,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980), the Court of Appeals for the former Fifth Circuit concluded that evidence which showed a 9.14% absolute disparity failed to demonstrate that the particular group's proportional representation on the venire was not fair and reasonable in relation to the number of such persons in the community. 611 F.2d at 1069–70 & n. 9. Similarly, in *United States v. Suttiswad,* 696 F.2d 645 (9th Cir.1982), the Court of Appeals for the Ninth Circuit held that a 7.7% absolute disparity "may be considered insubstantial" for purposes of the fair cross-section requirement. 696 F.2d at 649.

In a case that involved both Sixth Amendment and equal protection challenges to the venire, the Court of Appeals for the Third Circuit noted that "[t]he imbalance necessary to establish an equal protection or Sixth Amendment violation in the composition of a jury venire is not determined by a bright line test." *Ramseur v. Beyer,* 983 F.2d 1215, 1231 (3d Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). While the Third Circuit found the 14.1% absolute disparity present in *Ramseur* "to be of borderline significance" when compared with "the results of other cases," *id.* at 1232, the court ultimately concluded that "the evidence does not convincingly demonstrate that the representation of African–Americans on jury pools was unfair or unreasonable." *Id.* at 1234. Finally, in *Euell v. Wyrick,* 714 F.2d 821 (8th Cir.1983), the Court of Appeals for the Eighth Circuit [4] determined that a

---

4. In *United States v. Clifford,* 640 F.2d 150 (8th Cir.1981), the Eighth Circuit stated that "in the absence of any evidence indicating an opportunity to discriminate in selection procedures, the 10% figure approved in *Swain* is an appropriate standard for finding underrepresentation." 640 F.2d at 155 (finding that "absolute disparity of 7.2% does not represent substantial underrepre-

sentation"). Although *Clifford* involved a claim that a particular group's underrepresentation violated the Jury Selection and Service Act, 28 U.S.C. §§ 1861–69, rather than the fair cross-section requirement, "[t]he test for a constitutionally selected jury is the same whether challenged under the Sixth Amendment of the Constitution or under the Jury Selection and Service

venire which reflected a 7.5% absolute disparity did not show unconstitutional underrepresentation. 714 F.2d at 823.

The petitioner argues that the evidence presented in state court "is clearly indicative of a substantial unexplained disparity between the composition of the jury pool and the composition of the community with regard to African–Americans," Petitioner's Memorandum at 5, and that the decision by the Court of Appeals of Indiana accordingly contravenes precedent established under *Sanders v. State*, 259 Ind. 43, 284 N.E.2d 751 (1972) and *Fadell v. State*, 450 N.E.2d 109 (Ind.Ct.App.1983). Petitioner's Memorandum at 1, 5. Further, the petitioner contends that under the precedent established by *Sanders* and *Fadell*, the Court of Appeals of Indiana erred by failing to shift the burden to the State "to disprove the discrimination." *Id.* at 5. In *Sanders*, a case which predated the *Duren* decision by seven years, the Supreme Court of Indiana considered the issue of whether the appellant had established a "significant disparity" between the percentage of black citizens selected for jury duty and the percentage of black citizens in the community. 284 N.E.2d at 756. Because the appellant introduced no evidence to indicate how many of the persons who failed to appear for jury duty might have been black, the court concluded that

> [i]t would be an absurd exercise in speculation for this Court to invalidate a jury *selection* process when the only evidence on the subject relates solely to the persons *appearing* for duty rather than to the persons selected on the original panel. Therefore, we need not decide what constitutes a "significant disparity" since the appellant failed to introduce reliable data upon which to base a finding.

*Id.* at 757. Clearly, the identical situation obtains in the present case, and thus the petitioner cannot reasonably rely upon *Sanders* for support. Moreover, *Fadell* offers no assistance to the petitioner. Therefore, the state court was under no obligation to shift the burden to the State to disprove the "discrimination."

Because the disparity demonstrated by the petitioner's evidence is well within the absolute disparity limits set by this circuit and others, the court finds that the petitioner has failed to establish the second element of a *prima facie* Sixth Amendment fair cross-section violation. Even had the court found that the petitioner had satisfied the second part of *Duren*, however, he has failed to allege a pattern of systematic exclusion of potential jurors from the venire as required under *Duren* to establish a *prima facie* violation of the Sixth Amendment's fair cross-section requirement.

■■■■ In an effort to demonstrate that the St. Joseph County jury selection system systematically excludes African–Americans from jury venires, the petitioner claims that "[t]he evidence that Blacks are regularly under represented on jury venires in St. Joseph County certainly indicates that something inherent in the jury selection process produces this result." Petitioner's Memorandum at 5. The petitioner further claims that his case, together with three other cases in which underrepresentation of African–Americans on St. Joseph County venires was alleged— *Bond v. State*, 533 N.E.2d 589 (Ind.1989), *Wilder v. State*, 498 N.E.2d 1295 (Ind.Ct. App.1986), and *Hunt v. State*, an unpublished decision—"are in and of themselves evidence of Systematic [sic] exclusion" in the St. Joseph County jury selection system. Petitioner's Memorandum at 6. However, allegations which previously have been refuted by courts[5] are not the type of evidence of sys-

Act." *United States v. Sanchez–Lopez*, 879 F.2d 541, 546 (9th Cir.1989) (citation omitted).

5. In *Bond v. State*, 533 N.E.2d 589 (Ind.1989), the Supreme Court of Indiana concluded that "[t]he fact that the forty-person panel only included two blacks does not in and or itself indicate any pattern of exclusion." 533 N.E.2d at 591. In *Wilder v. State*, 498 N.E.2d 1295 (Ind.Ct. App.1986), a panel of the Court of Appeals of Indiana held that, notwithstanding the defen-

dant's claim that a jury venire containing only two blacks out of nineteen persons deprived him of a jury representative of the community, "the constitution does not require the state to actually impanel in every venire a representative cross section." 498 N.E.2d at 1296–97. In *Hunt v. State*, an unpublished decision, the issue was waived due to the defendant's failure to cite authority or to present a factual foundation for his claim. *Prince v. State*, No. 71A03–9211–CR–

tematic exclusion envisioned by the Supreme Court in *Duren*. Moreover, evidence of a discrepancy on the petitioner's venire cannot by itself demonstrate systematic exclusion. *See Singleton v. Lockhart*, 871 F.2d 1395, 1399 (8th Cir.), *cert. denied*, 493 U.S. 874, 110 S.Ct. 207, 107 L.Ed.2d 160 (1989).

■■ In *Duren*, the petitioner's "undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year" led the Supreme Court to conclude that the evidence "manifestly indicate[d] that the cause of the underrepresentation was systematic—that is, *inherent in the particular jury-selection process utilized*." 439 U.S. at 366, 99 S.Ct. at 669–70 (alteration and emphasis added). In the present case, the petitioner claims that "because no records are kept on the racial composition of jury venires the Petitioner is effectively precluded from the opportunity to prove systematic exclusion of any group from jury venires in St. Joseph County." Petitioner's Memorandum at 4. Notwithstanding the petitioner's complaint as to the apparent lack of available records, the court understands the heart of the petitioner's argument to be that because "[t]here are heavier minority concentrations in certain areas of the county," and because "the computer selection system employed by St. Joseph County does limit the number of prospective jurors which [sic] may be called from any one area in the county," St. Joseph County's practice of using of voter registration lists as the sole source of prospective jurors—without consideration of the race of individual registered voters—effectively limits the number of African–Americans likely to appear as prospective jurors on St. Joseph County jury venires. *See id.* at 4; *see also id.* at 3 ("The jury administrator for the St. Joseph Superior Court, stated that on the questionnaires she mails to the individuals selected by the computer to serve on jury panels, there is no question relating to race and no way to discern the individual's race from the questionnaire.").

Assuming that this is the essence of the petitioner's argument, the court notes that both the Court of Appeals for the Seventh

Circuit and the Supreme Court of Indiana have recently reaffirmed the use of voter registration lists as the sole source of names for jury venires. *United States v. Ashley*, 54 F.3d 311, 314 (7th Cir.), *cert. denied*, — U.S. ——, 116 S.Ct. 232, 133 L.Ed.2d 161 (1995) (rejecting an argument that the Court of Appeals should require district courts to implement selection schemes which "ensure that racial minorities are represented on every jury wheel proportional to their presence in the community from which the venire is chosen"); *United States v. Guy*, 924 F.2d 702, 706 (7th Cir.1991) ("[T]he federal courts that have addressed the constitutionality of voter registration lists unanimously agree that a state may constitutionally draw its jurors from voter lists."); *Bradley v. State*, 649 N.E.2d 100, 104 (Ind.1995) ("Indiana has previously expressed general approval of the use of voter registration lists for the selection of prospective jurors.... [P]roper use of such lists requires that they represent a *reasonable* community cross section.") (alteration and emphasis added).

Other circuits that have dealt with the question of whether the Sixth Amendment requires voter registration lists to be supplemented by additional sources in order to offset racial underrepresentation have consistently found that, at least where absolute disparity is within reasonable limits, it does not. In *United States v. Ireland*, 62 F.3d 227 (8th Cir.1995), the Court of Appeals for the Eighth Circuit held that "[t]he mere fact that one identifiable group of individuals votes in a lower proportion than the rest of the population does not make a jury selection system illegal or unconstitutional." 62 F.3d at 231. Similarly, in *United States v. Cecil*, 836 F.2d 1431 (4th Cir.), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988), the Court of Appeals for the Fourth Circuit rejected the defendants' argument that *Duren* had established a rule requiring supplementation of voter registration lists when such lists failed "to include sufficiently the names of those in the appropriate ... racial group who had failed to register." 836 F.2d at 1450. In reaching its decision, the Fourth Circuit cited a ruling in *California v.*

384 (Ind.Ct.App. Jan. 27, 1994) (unpublished memorandum decision) at 4 n. 2.

*Harris,* 468 U.S. 1303, 105 S.Ct. 1, 82 L.Ed.2d 807 (1984), by then-Justice Rehnquist, sitting as a single Justice on a motion to stay a judgment of the California Supreme Court. In *Harris,* the State contended that the state supreme court had misapplied *Duren* to find a violation of the fair cross-section requirement "where there is merely underrepresentation of cognizable class because of the failure of class members to register to vote." 468 U.S. at 1304, 105 S.Ct. at 1. Justice Rehnquist denied the State's motion to stay, explaining that

> [w]hether this sort of jury selection procedure can be described as "systematically" excluding classes that do not register to vote in proportion to their numbers, and whether the need for efficient jury selection may not justify resort to such neutral lists as voter registration rolls even though they do not perfectly reflect population, see 439 U.S., at 368–370, 99 S.Ct., at 670–671, are by no means open and shut questions under *Duren.*

*Harris,* 468 U.S. at 1304, 105 S.Ct. at 1–2. The Fourth Circuit, in interpreting Justice Rehnquist's statement, concluded:

> We take it to be "clear" from this statement of Chief Justice Rehnquist that neither *Duren* nor *Taylor*—or for that matter, any other decision of the Supreme Court—supports the view ... that a jury selection process which uses as its primary source solely a voter registration list, which has underrepresentation of a cognizable class arising from the failure of its members to register to vote in sufficient numbers but not because of any "systematic" exclusion of such a group, will not satisfy the constitutional ... jury cross-section requirement.

*Cecil,* 836 F.2d at 1451. For all of the above reasons, the court is quite comfortable in holding that the St. Joseph County system of random computer selection using voter registration lists as the sole source of prospective jurors passes constitutional muster under the Sixth Amendment fair cross-section requirement.

### B. Equal Protection

 In addition to his Sixth Amendment claim, the petitioner alleges that his "Fourteenth Amendment right to a jury drawn from a fair cross section of the community has undoubtedly been denied." Petitioner's Memorandum at 6. The court has previously discussed the fact that the Due Process Clause of the Fourteenth Amendment incorporates the Sixth Amendment right to a fair cross-section with respect to the states. Thus, since the petitioner fails to make his claim with specificity, the court assumes that the petitioner refers here to the Equal Protection Clause of the Fourteenth Amendment. Indeed, in support of his Fourteenth Amendment claim, the petitioner relies on *Ford v. Hollowell,* 385 F.Supp. 1392 (N.D.Miss.1974), a district court case which involved a claim of racial discrimination in the equal protection context. Although the elements of a *prima facie* case for an equal protection claim in the context of jury selection resemble those of a fair cross-section claim under *Duren,* the purpose of an equal protection claim is to establish whether the disparity between the proportional representation of a discrete group on jury venires and its proportional representation in the community is the result of a discriminatory purpose. *Duren v. Missouri,* 439 U.S. 357, 368 n. 26, 99 S.Ct. 664, 670 n. 26, 58 L.Ed.2d 579 (1979); *United States v. Grisham,* 63 F.3d 1074, 1081 (11th Cir.1995). "Thus, whereas the inquiry in a fair cross-section claim focuses on the representativeness of the jury venire, the focus of an equal protection claim is whether members of a discrete group have been *intentionally* denied the opportunity to serve on a jury." *Grisham,* 63 F.3d at 1081 (emphasis added).

 The Supreme Court of the United States set out the test for an equal protection violation in the selection of a jury venire in *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). In order to make a *prima facie* case for an equal protection violation, a petitioner must establish that (1) the group to which the petitioner belongs is one that is a recognizable, distinct class of persons capable of being singled out for discriminatory treatment; (2) there has been

"substantial underrepresentation" of that particular class over a significant period of time; and (3) the procedure which is being used is either "susceptible of abuse or is not racially neutral" to support the inference of discrimination which has been raised by the substantial underrepresentation. *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280.

 The petitioner, an African–American, clearly meets the first part of *Castaneda.* As with the *Duren* test, however, the petitioner falls afoul of the second and third elements of *Castaneda.* In practice, the level of underrepresentation necessary to establish the second element of a *prima facie* equal protection violation is the same as that required for a fair cross-section violation, although the second element of *Castaneda* does require that underrepresentation of the relevant group occur over a significant period of time. (In fair cross-section cases, the length of time is a factor to be considered under the third element of systematic exclusion.) In the fair cross-section context, the Seventh Circuit has cited *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), an equal protection case, for the proposition that "discrepancies of less than ten percent, standing alone, cannot support a claim of underrepresentation." *United States v. McAnderson,* 914 F.2d 934, 941 (7th Cir.1990), *cert. denied sub nom. Cranshaw v. United States,* —— U.S. ——, 115 S.Ct. 372, 130 L.Ed.2d 323 (1994). It is therefore reasonable to assume that the standard remains applicable in the context of equal protection.[6] Because the petitioner has demonstrated an absolute disparity of no more than 7.8% in the present case, the level of underrepresentation in his own case does not rise to the level necessary to support a claim of purposeful discrimination. Moreover, the petitioner has failed to support his claim of purposeful discrimination with evidence of such discrimination over a significant period of time, as required under *Castaneda.* First, the petitioner's deposition of the St. Joseph Superior Court bailiff does not offer credible statistical evidence of underrepresentation. *See* Petitioner's Memorandum at 2–3. The record presented here—which amounts solely to the evidence in this petitioner's case—pales in comparison to the eleven-year period documented by the petitioner in *Castaneda v. Partida.* In addition, the petitioner's reliance on prior cases for evidence of ongoing underrepresentation does not support his claim. As noted above, proof of unconstitutional underrepresentation requires more than allegations that have previously been refuted by courts of law. Thus, the petitioner has failed to meet *Castaneda*'s second requirement of substantial underrepresentation over a significant period of time.

Finally, since the petitioner readily admits that "there is no question relating to race and no way to discern the individual's race from the questionnaire" which is mailed to individuals randomly selected by the computer, apparently the petitioner's argument is that court officials *know* that blind selection will result in underrepresentation of African–Americans: Failure to include a question relating to the individual's race allows St. Joseph County court officials to purposefully discriminate against African–Americans rather than affirmatively compensating for the discrepancy. However, even were this the petitioner's argument, the court need not reach its merits since the petitioner has

6. *See also Alexander v. Louisiana,* 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972) (14% disparity sufficient to create *prima facie* case only in combination with other evidence of discrimination); *United States v. Grisham,* 63 F.3d 1074, 1082 (11th Cir.1995) (holding that absolute disparities ranging from 13% to 15.5% were not sufficient to support inference of acting with an illicit purpose); *Ramseur v. Beyer,* 983 F.2d 1215, 1231–35 (3d Cir.1992) (14.1% absolute disparity did not support a claim of underrepresentation in either the fair cross-section context or the equal protection context); *United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1126–27 (11th Cir.) (en banc) (rejecting equal protection challenge to a venire that, under one stipulation of facts, underrepresented blacks by 9.67%), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981). As the district court noted in the *Ford* case on which the petitioner relies, "The burden of proving racial discrimination rests upon the petitioner in a habeas corpus proceeding and, where the underrepresentation by blacks is not *extremely* disproportionate, this burden can be a heavy one." *Ford v. Hollowell,* 385 F.Supp. 1392, 1398 (N.D.Miss.1974) (emphasis added) (granting writ of habeas corpus where State failed to rebut *prima facie* case of purposeful discrimination based on underrepresentation of 63%).

failed to demonstrate the degree of under-representation necessary to raise the requisite inference of purposeful discrimination.

### CONCLUSION

Accordingly, for the reasons set forth above, the petition for a writ of habeas corpus is **DENIED. IT IS SO ORDERED.**

### APPENDIX "A"

Kevin Prince, Appellant–Defendant

vs.

State of Indiana, Appellee–Plaintiff

No. 71A03–9211–CR–384

COURT OF APPEALS OF INDIANA
THIRD DISTRICT

June 24, 1994

Appeal from the St. Joseph Superior Court, The Honorable William T. Means, Judge, Cause No. 71D04–9101–CF00068.

ATTORNEY FOR APPELLANT:

MICHAEL P. REHAK
South Bend, IN 46601

ATTORNEYS FOR APPELLEE:

PAMELA CARTER
Attorney General of Indiana
LOUIS E. RANSDELL
Deputy Attorney General
Office of Attorney General
Indianapolis, IN 46204–2794

### MEMORANDUM DECISION

GARRARD, J.

A jury convicted Kevin Prince (Prince) of murder. He now appeals.

FACTS AND PROCEDURAL HISTORY:

Elizabeth Szeleczky (Szeleczky) was a seventy-five year old widow who lived alone in South Bend, Indiana. On June 26, 1988, she was found murdered in her bed. Szeleczky had been stabbed to death, and police found semen on her bed. Fingerprints and hair were also recovered from the crime scene.

Szeleczky was last seen alive at 11:15 p.m. on June 25, 1988.

On October 12, 1990, Prince was charged with battery in an unrelated incident. Hair samples, blood, and fingerprints were obtained from Prince on November 26, 1990. On January 18, 1991, the State of Indiana charged Prince with the murder of Szeleczky. A jury trial began on February 17; Prince was convicted of murder on February 24, 1992. Prince was sentenced to a prison term of 40 years. After Prince's motion to correct errors was denied on August 14, 1992, Prince filed for his praecipe. He now appeals.

ISSUES:

Prince presents the following issues:

I. Whether the St. Joseph County jury selection process unconstitutionally excludes African–Americans.

II. Whether the trial court erred by admitting DNA evidence presented at trial by the State.

III. Whether the trial court erred by allowing witness testimony concerning Prince's prurient activity.

IV. Whether the trial court erred by allowing a pathologist to state his opinion that the murder was sexually motivated.

DISCUSSION:

Issue I

Prince first argues that the St. Joseph County jury selection process violated his constitutional rights by excluding African–Americans from the jury panel.

A 1990 census of St. Joseph County reported that nearly ten percent of the population[1] was African–American. St. Joseph County selects potential jurors from voter rolls. The voter rolls do not list the race of the voter. 1200 people were drawn from the voter rolls to serve on the jury panel for January and February 1992. Of the 1200 individuals, 50 were selected as potential jurors for this case. Of the 50–person panel assembled for *voir dire*, one person was an African–American.

---

1. According to the 1990 census, 247,052 people live in St. Joseph County, including 24,190 African–Americans (9.8%). The record does not disclose the percentage of African–Americans in St. Joseph County who are of voting-jury age.

Our supreme court utilized the federal standard for reviewing possible constitutional violations arising from a jury which is not drawn from a "fair cross section" of the community in *Bond v. State* (1989), Ind., 533 N.E.2d 589, 591. *Bond* held:

> The defendant must show (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.

*Id.* (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)).

Prince is an African–American and obviously a member of a "distinct group." In regard to the second requirement, Prince argues that one African–American on a 50–person venire drawn from a county with a ten percent African–American population is not fair or reasonable. Prince attempts to garner support for his position by citing cases arising from the county where defendant-appellants have argued that the jury selection process is unconstitutional, due to under representation of African–Americans on venires (*Bond v. State* (1989), Ind., 533 N.E.2d 589, *Wilder v. State* (1986), Ind.App., 498 N.E.2d 1295, and a 1993 memorandum decision.) Prince's theory is that St. Joseph County's jury selection process must be unconstitutional, otherwise defendants would not have raised the issue over the last few years.[2] The evidence Prince presented, however, supports the conclusion that the County utilizes a process which produces venires which are fair and reasonable in regard to racial representation. Prince's counsel deposed the county auditor, wherein the following exchange occurred:

> Q: Okay. Would it be your opinion, based upon your knowledge o[f] the community, that there would be as

many registered minority voters as there would be white voters?

> A: You say "as many," being—
> Q: Percentage.
> A: Percentage. I would say probably, there would be; depending on [the] particular time as regards to election, you always have a drive to register more people. Then they lapse by not voting, so probably fairly close to the same percentage. At different times one might be higher than the other, from what I know.

(R. 2006–7).

In an attempt to show "systematic exclusion," Prince presents evidence that the St. Joseph County voter rolls do not list a voter's race. He also notes that the County does not maintain a log listing the racial composition of past venires. Prince's argument is that the County should track the racial composition of jury venires and then devise a computer program to ensure that a future venire's racial composition matches that of the County. As we noted in *Wilder*, systematic *exclusion* must be demonstrated, "the constitution does not require the state to actually impanel in every venire a representative cross section" of the community. *Wilder*, 498 N.E.2d at 1297 (citing *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975)). Prince has failed to demonstrate any such exclusion; he has merely asserted the County could do more to ensure a racially proportionate venire. Prince's constitutional rights were not violated.

Issue II

Prince argues the trial court erred by admitting DNA evidence the State presented at trial. Prince acknowledges our Supreme Court's acceptance of DNA evidence in criminal cases in *Hopkins v. State* (1991), Ind., 579 N.E.2d 1297, 1303. Prince asks us to reconsider the use of such evidence in light of the period of time such evidence has been available and "the limited amount of research" conducted.

---

2. The two published cases, *Bond* and *Wilder*, disclose that African–Americans constituted 5 and 10.5 percent of the venire, respectively.

*Hunt* is an unpublished decision in which the subject issue was waived due to failure to cite authority or present a factual foundation.

Prince presented evidence that his cousin had slept at his house on the night of Szeleczky's murder. Prince then called his own expert witness, a Dr. Karl. Dr. Karl testified that factoring blood relatives into the DNA match probability analysis could alter the odds of a DNA match. Prince has effectively created a battle of qualified experts; a conflict of this nature is to be resolved by the trier of fact. *Hopkins,* 579 N.E.2d at 1303 (citing *Orr v. State* (1984), Ind.App., 472 N.E.2d 627). We find that in this case the evidence adequately supports the jury's finding.

### Issue III

Prince argues the trial court erred by allowing witness testimony concerning his prurient activity.

Prince and his family lived in one half of a duplex; Michelle Hamilton (Hamilton) lived in the other. Hamilton was called to testify by the State at trial. While on direct, Hamilton discussed conversations and sexual acts she and Prince engaged in. Prince argues in his brief that this testimony was improper. Prince, however, failed to object to Hamilton's testimony concerning Prince's prurient acts.

Prince filed several motions in limine, one of which pertained to Hamilton. In part it stated:

> The defendant believes that the State of Indiana will attempt to introduce evidence of other bad conduct relating to the defendant through the testimony of Michelle Hamilton, *such testimony revolving around an incident wherein the defendant allegedly attempted to gain entrance to Ms. Hamilton's duplex* through the commonly shared basement of the defendant and Ms. Hamilton. Such conduct is not relevant to the proceedings before the Court and does not fall within one of the few exceptions that would make such conduct admissible under Indiana evidentiary standards and case law.

(R. 150, emphasis supplied).

While Hamilton was on direct, the following exchange occurred:

Q: Did you and the defendant—Did he ever talk to you about what he did in the basement of where he lived?

A: Yeah.

Q: Tell the folks of the jury about that.
 [Prince's counsel]: Your Honor, may we approach for a minute?
 The Court: Yes.
 [Prince's counsel]: Judge, I would just renew the—
 The Court: Sure.
 [Prince's counsel]: —the objection. I made [in] my motion in limine.

(R. 1312).

A defendant may not state one reason for an objection at trial and then rely upon another on appeal. *Brooks v. State* (1990), Ind., 560 N.E.2d 49, 57; *Jester v. State* (1990), Ind., 551 N.E.2d 840, 843. Prince objected to Hamilton testifying about an incident wherein Prince attempted to break into Hamilton's apartment. On appeal, Prince objects to Hamilton's testimony regarding sexual acts and conversations that she and Prince had engaged in. Prince failed to properly object to this testimony at trial. Prince's action constitutes waiver of the issue. *Id.*

### Issue IV

Prince argues the trial court committed reversible err by allowing a pathologist to state his opinion that the murder was sexually motivated.

Dr. Robert Harman (Harman) conducted the autopsy of Szeleczky. While Dr. Harman was on direct, the State asked him if Szeleczky's wounds "were consistent with a sex related killing." Prince objected to the question, and argued that Dr. Harman was not qualified to give such an opinion.

Whether a witness is qualified to testify as an expert is within the discretion of the trial court. *Hicks v. State* (1989), Ind., 544 N.E.2d 500, 505. We will not reverse the court's ruling absent an abuse of discretion. *Id.* An expert witness does not have to demonstrate a precise quantum of knowledge. *White v. State* (1989), Ind., 547 N.E.2d 831, 837. The expert should be shown to possess sufficient skill, knowledge or experi-

ence in the field to allow the trial court to find the witness's opinion will aid the trier of fact. *Id.*

Evidence disclosed Dr. Harman has been a pathologist for sixteen years. He was involved in a large number of criminal cases, and accompanied other pathologists in such cases. He attended professional meetings of forensic pathologists. He received psychiatry training in medical school. Szeleczky was stabbed some 50 times, the wounds concentrated in the upper chest-breast area. Szeleczky's legs had been spread apart, her nightgown was pulled up to her chest. Semen was found on the bedding where Szeleczky was found. We find no abuse of discretion in allowing Dr. Harman to testify as to whether Szeleczky's wounds were consistent with a sex related killing.

The trial court is affirmed.

HOFFMAN and SHIELDS, JJ., concur.